TOMASSO MORGERA *v.* BEATRICE
CHIAPPARDI ET AL.
(AC 21418)

Flynn, Bishop and Healey, Js.

Argued September 18, 2002—officially released January 7, 2003

*Roger L. Crossland*, with whom, on the brief, was *Ridgely W. Brown*, for the appellant (named defendant).

*Michael Jon Barbarula*, for the appellee (plaintiff).

*Opinion*

HEALEY, J. This appeal is taken from the judgment of strict foreclosure[1] of a purchase money mortgage on real estate located at 21 Plymouth Avenue in Norwalk

---

[1] At oral argument, the defendant Beatrice Chiappardi claimed that this appeal was not taken from a final judgment. We do not agree. The trial court articulated the necessary findings for finality, namely, the judgment of strict foreclosure, the amount of the debt and the setting of law days. See *Benvenuto* v. *Mahajan*, 245 Conn. 495, 498, 715 A.2d 743 (1998). The defendant's claim that she was unable to challenge the articulation, and that therefore the judgment is not final, is without merit. The record reveals that the defendant did not file a memorandum of law in opposition to the plaintiff's motion for articulation. Furthermore, the defendant failed to file a motion for review with this court pursuant to Practice Book § 66-7. Our Supreme Court has stated that "where a party is dissatisfied with the trial court's response to a motion for articulation, he may, and indeed under appropriate circumstances he must, seek immediate appeal of the rectification memorandum to this court via the motion for review." (Internal quotation marks omitted.) *Highgate Condominium Assn.* v. *Watertown Fire District*, 210 Conn. 6, 21, 553 A.2d 1126 (1989).

and the denial of the counterclaim[2] filed by the defendant Beatrice Chiappardi[3] after the plaintiff, Tomasso Morgera, instituted a foreclosure action against her. On appeal, the defendant makes two interrelated claims. She maintains that the trial court acted inappropriately when it refused (1) to consider and to take evidence on her claim of setoff and on her counterclaim, and (2) to hear her claim of setoff and her counterclaim even though they never had been the objects of a request to revise, a motion to strike, a motion for summary judgment or a request to bifurcate. We agree with the defendant and reverse the judgment of the trial court.

It is helpful to begin our analysis of the defendant's claims by outlining the pleadings in this complex case. The complaint alleges the execution of a mortgage, deed and note on 21 Plymouth Avenue in Norwalk in the principal sum of $250,000 with interest. It further alleges that the mortgage was in default and seeks, inter alia, a judgment of foreclosure (strict or by sale), a deficiency judgment and damages. The answer effectively denies all the allegations of the complaint, leaving the plaintiff to his proof.[4] The defendant also raised three special

[2] The plaintiff, Tomasso Morgera, claims that the defendant Beatrice Chiappardi does not challenge the judgment of strict foreclosure. We do not agree. The record specifies that the appeal is taken from the "Judgment of Strict Foreclosure and Denial of Counter Claim." In addition, the defendant's brief and oral argument clearly indicated that she was challenging the judgment of strict foreclosure as well as the denial of her counterclaim, and her claim for setoff and her special defenses. We also note that "[w]here the plaintiff's conduct is inequitable, a court may withhold foreclosure on equitable considerations and principles." (Internal quotation marks omitted.) *Fidelity Bank* v. *Krenisky*, 72 Conn. App. 700, 705, 807 A.2d 968, cert. denied, 262 Conn. 915, 811 A.2d 1291 (2002).

[3] The plaintiff also named Vincent Sullivan as a defendant. The action against him was withdrawn during the trial, leaving Beatrice Chiappardi as the sole defendant. We therefore refer in this opinion to Beatrice Chiappardi as the defendant.

[4] In her answer, the defendant, in a separately numbered paragraph that is not directed to any specific allegation in the complaint, alleges: "As to the relief requested of judgment foreclosing the mortgage, the defendant simply requests that the court exercise its discretion in equity and under

defenses. The first alleged that "[t]he plaintiff is guilty of fraud and misrepresentation regarding the sale of this property as well as the other two properties as part of the same package deal to the defendant."[5] The second special defense alleged that the doctrine of unclean hands applies. The third special defense contended that the plaintiff should be equitably estopped from enforcing the note and mortgage due to his fraud and misrepresentation. In addition, the defendant alleged a claim for setoff and a counterclaim.[6] The plaintiff's reply to the defendant's claim for setoff, and her special defenses and counterclaim effectively denied all their allegations.

The issues on appeal cannot reasonably be understood without an additional recital of certain underlying circumstances that were disclosed by testimonial and documentary evidence, including a long offer of proof by the defendant urging the consideration of the setoff

law and defendant denies that the plaintiff is entitled to any of the relief requested."

[5] The first special defense referred to two pieces of real estate in Norwalk located at 23 Center Avenue and 29 Center Avenue, which were conveyed by the plaintiff to the defendant as part of a "package deal," the significance of which is discussed in this opinion.

[6] The defendant's pleading states in relevant part: "By Way of Set Off & Counterclaim. First count: (1) In accordance with Connecticut General Statute Section 52-139, the defendant Beatrice Chiappardi hereby claims a set off against the plaintiff's debt. (2) The plaintiff, pleading in the alternative, either fraudulently misrepresented, negligently misrepresented, or with reckless disregard for the truth, sold and conveyed by way of contract and then by way of deed along with affirmative misrepresentations in title affidavits, the subject property and properties at 23 Center Avenue, Norwalk, and 29 Center Avenue, Norwalk, Connecticut. (3) The plaintiff misrepresented the zoning, code compliance and [general] regulatory compliance of these properties thereby proximately causing damages to the defendant and counterclaimant Beatrice Chiappardi including the differential fair market value of the properties, the losses suffered by the defendant and counter-claimant in putting financing in place and incurring expenses on the properties and the caring charges, pain and suffering, damage to credit, lost expenses in fix up of the properties and loss because of her inability to bring the properties into compliance and forced sale of the properties."

and counterclaim adduced at the trial of this foreclosure case.[7]

The plaintiff and the defendant are related; he is her uncle. He owned three pieces of real estate in Norwalk located at 21 Plymouth Avenue, 23 Center Avenue and 29 Center Avenue. He resided at 21 Plymouth Avenue. The Center Avenue properties were rental properties, and each had three rental units when the plaintiff owned them. Prior to his negotiations with the defendant concerning the sale of the three properties, the plaintiff had made efforts to sell the two Center Avenue properties and had them listed with the multiple listing service in Norwalk. He had received notices of noncompliance and cease and desist orders from the city of Norwalk as to both Center Avenue properties for zoning and housing code violations. Among other notices and threats of zoning enforcement action, there was a letter from the zoning inspectors on behalf of the zoning commission of the city of Norwalk to the listing broker who had listed the plaintiff's Center Avenue properties. The letter pointed out that those properties were in violation of Norwalk zoning regulations and set out how the violations were to be corrected.[8] In addition, the letter

[7] The proceedings in the trial court, including the defendant's efforts to introduce evidence on the setoff and counterclaim, took three days and generated a transcript of approximately 280 pages. Although the court generally refused the defendant's proffer, it did admit some evidence concerning the setoff and counterclaim, calling its decision to do so "dicta." During the proceeding, evidence was given not only by a real estate expert, but also by the plaintiff, his wife, the defendant Vincent Sullivan, who was named as a defendant in this action but against whom the complaint later was withdrawn, and an attorney who had represented the plaintiff and had drawn certain documents concerning not only 21 Plymouth Avenue, but also other properties that are involved in this action that are at 23 Center Avenue and 29 Center Avenue in Norwalk at times relevant to the conveyances by the plaintiff to the defendant. Any fair disposition of the equities requires a consideration of the testimony and documents proffered, whether characterized as "dicta" by the court or otherwise.

[8] The letter stated in relevant part that "the following is required to correct those violations. . . . *Full* architectural plans showing existing conditions

directed that "[a]ll prospective purchasers should be made aware that until plans are received and permit issues we consider these properties in violation and anyone who purchase[s] the properties will be subject to legal action and fines." The letter also stated that the Norwalk "Corporation Counsel is pursuing legal action against the [plaintiff] regarding the Zoning Violations." As a result of those violations, the listing of the Center Avenue properties was canceled, and the properties were removed from the multiple listing service.

As previously stated, the plaintiff and the defendant are uncle and niece. She was a single mother with three children and worked two jobs. She trusted the plaintiff. She had assisted him when he was hurt. She wrote his checks because he could read, but not write, English. She maintained that he had indicated to her that it would be to her economic advantage if she purchased the properties. She said that he wanted to sell her all three properties and that he would not sell her the Plymouth Avenue property unless she also bought the properties at 23 Center Avenue and 29 Center Avenue. The plaintiff never told the defendant of the zoning and housing problems with the Center Avenue properties, which he already had encountered and were ongoing before, during and after his transfer to her of the Center Avenue properties.

The three properties ultimately were sold to the defendant in separate conveyances. The property at 23 Center Avenue was transferred by deed on August 20, 1997, the property at 29 Center Avenue was transferred on August 29, 1997, and the property at 21 Plymouth Avenue was transferred on September 29, 1997. Documents memorializing mortgage loans from third party

and proposed conditions. Site plan/survey of each property . . . for storage/parking only." (Emphasis in original.)

lenders[9] were recorded by the defendant on the land records for each of the Center Avenue properties. A purchase money mortgage in the amount of $250,000[10] made by the defendant to the plaintiff was placed on the property at 21 Plymouth Avenue. Separate agreements to purchase were drawn for the three properties. The two agreements pertaining to the Center Avenue properties were signed by the parties; however, the third agreement to purchase the 21 Plymouth Avenue property never was signed by the parties. The closings on the three properties were held on three separate dates, all three being held within a time period of approximately thirty days in August and September, 1997. The plaintiff left the United States to reside in Italy shortly after the third closing.[11]

After the closings on all the properties, a fire occurred in one of the Center Avenue properties. It was only then that the defendant learned from the fire marshal and the city of the numerous housing violations. She also learned of the zoning violations, which she was unable to cure. Ultimately, she was forced to give up both of the Center Avenue properties when she transferred them to a third party, who took them by assuming the mortgages on them. She received no compensation on those transfers.

Both parties contend that our "transaction" rule supports their respective positions. See, e.g., Practice Book

---

[9] The record is not clear whether the defendant was represented by counsel for the three conveyances involved. She did refer to a "bank" attorney participating in the transfer of the Center Avenue properties. There is documentation in the record that suggests that no bank, in the conventional sense, was involved in the Center Avenue financing, but that financing was by a private third party lender. The plaintiff was represented throughout by a private attorney, if not by two attorneys.

[10] The mortgage, deed and note for the purchase money mortgage on the property at 21 Plymouth Avenue made no reference to an interest rate to be charged on that mortgage.

[11] The plaintiff, who resided in Naples, Italy, at the time of the trial returned in 2000 when he testified at the trial.

§ 10-10;[12] *Wallingford* v. *Glen Valley Associates, Inc.*, 190 Conn. 158, 161, 459 A.2d 525 (1983); *Isaac* v. *Truck Service, Inc.*, 52 Conn. App. 545, 556, 727 A.2d 755 (1999), aff'd, 253 Conn. 416, 752 A.2d 509 (2000). "The 'transaction test' is one of practicality, and the trial court's determination as to whether that test has been met ought not be disturbed except for an abuse of discretion. . . . Where the underlying purposes of Practice Book § [10-10], to wit, judicial economy, avoidance of multiplicity of litigation, and avoidance of piecemeal disposition of what is essentially one action, are thwarted rather than served by the filing of a cross claim, the cross claim may properly be expunged." (Citations omitted.) *Jackson* v. *Conland*, 171 Conn. 161, 166–67, 368 A.2d 3 (1976); *Mechanics Savings Bank* v. *Townley Corp.*, 38 Conn. App. 571, 574–75, 662 A.2d 815 (1995).

"The term [counterclaim] itself is a general and comprehensive one, naturally including within its meaning all manner of permissible counter-demands. . . . [T]he word 'counterclaim' was intended to be a generic term for all cross demands other than setoffs, whether in law or equity." (Citation omitted; internal quotation marks omitted.) *Gattoni* v. *Zaccaro*, 52 Conn. App. 274, 280, 727 A.2d 706 (1999).

The plaintiff claims that the court's legal conclusions and evidentiary rulings were correct for two reasons. First, the plaintiff argues in his brief that "the [fraud] allegations were unrelated to the underlying transac-

---

[12] Practice Book § 10-10 provides in relevant part: "Supplemental Pleadings; Counterclaims

"Supplemental pleadings showing matters arising since the original pleading may be filed in actions for equitable relief by either party. In any action for legal or equitable relief, any defendant may file counterclaims against any plaintiff and cross claims against any codefendant provided that such counterclaim and cross claim arises out of the transaction or one of the transactions which is the subject of the plaintiff's complaint . . . ."

tion," and, second, that "the allegations as pleaded did not relate to the making, validity or enforcement of the note and mortgage that were the subject of [the] plaintiff's foreclosure action." The defendant claims that the test for the application of the transaction rule in this case should be whether the related acts arose prior to or during the development of the note and mortgage, and that her counterclaim arose from the plaintiff's fraudulent representations which caused her to "make" the note and mortgage on the Plymouth Avenue property, which was part of a "package" of conveyances or property represented to be legal, income producing multifamily properties. She claims, therefore, that the misrepresentation, conveyances and mortgage are appropriately related for the purpose of applying the transaction rule. We agree with the defendant.

Circumstances, additional to those already set out, bear on the "transaction" issues. There can be little, if any, question of the trust and reliance of the defendant on the plaintiff. Her unfortunate lack of sophistication contributed to her vulnerability to the claimed misrepresentations of the plaintiff. In urging her to buy all three properties, the plaintiff told her, "I'll give you a good deal because you've been working all your life, and I want to give you a break. These houses will make you good money." He also stated that "we'll make it a deal. If you buy those two [Center Avenue properties] from me, you'll have to buy 21 [Plymouth Avenue] because I want to leave here and I want to go to Italy." The defendant told him, "I don't think I am [able]. I am a single parent and I don't have any money. I don't think I can." She further testified that the plaintiff "continuously asked me to buy them . . . telling [me] what a great deal it was." The plaintiff assured her, *"They're all legal. They're good."* (Emphasis added.) She testified that "everyday he'd call" and tell her he had "an offer."

Finally, the defendant hired a man to see if he could find a way for her to buy the three properties. It took him one year to get the loans to enable her to purchase the Center Avenue properties. It is interesting to note her claim that the plaintiff required that she purchase the two properties with the various violations prior to selling her the 21 Plymouth Avenue property.

On the basis of the defendant's claims, it would be reasonable for a fact finder to conclude that the plaintiff's representation to his niece that "all" the properties were "legal" and that all were "good" was material in her ultimate decision to buy. Moreover, it also would be reasonable for a fact finder to conclude that the plaintiff clearly knew otherwise as to the Center Avenue properties when he pressured her to buy the three properties. Our Supreme Court has "pointed out that when false representations are made for the purpose of inducing an act to another's injury, necessarily there is the plain implication that the representations were made with the intent to deceive." *Miller* v. *Appleby*, 183 Conn. 51, 57 n.1, 438 A.2d 811 (1981). "The intentional withholding of information for the purpose of inducing action has been regarded . . . as equivalent to a fraudulent misrepresentation. 1 Restatement (Second), Contracts § 161 . . . ." (Citations omitted.) *Pacelli Bros. Transportation, Inc.* v. *Pacelli*, 189 Conn. 401, 407, 456 A.2d 325 (1983).

The "transaction" test is one of practicality, and its purposes, which have been recognized by case law, should not be thwarted in its application. The circumstances of this case disclose that the allegations of the defendant's counterclaim arose out of the transaction that "is the subject of the plaintiff's complaint . . . ." Practice Book § 10-10. There can be no confusion about that, as the allegations of the counterclaim include the following: "2. The plaintiff, pleading in the alternative, either fraudulently misrepresented, negligently misrep-

resented, or with reckless disregard for the truth, sold and conveyed by way of contract and then by way of deed along with affirmative misrepresentations in title affidavits, *the subject property* and properties at 23 Center Avenue, Norwalk, and 29 Center Avenue, Norwalk, Connecticut." (Emphasis added.) Not only does the defendant plead in the alternative, which pleading includes an allegation of fraudulent misrepresentation, but she specifically refers to "the subject property," i.e., 21 Plymouth Avenue, which is the property being foreclosed. Moreover, whether the term "package" or "bundle" is used to refer to the grouping or combining of the three properties, the evidence demonstrates that they were not in substance separate and distinct occurrences.

In addition, insofar as the court's posture permitted the defendant to do so, the concatenation of circumstances engendered by the plaintiff's fraudulent misrepresentations made for a reasonable nexus between the counterclaim and his conduct in inducing the defendant's making of the note and mortgage on the property at 21 Plymouth Avenue, hence raising serious questions about their validity and enforcement.

The defendant also claims that the court inappropriately refused to allow her to present the evidence to support her counterclaim. Implicit in her claim is the argument that she was not given a fair opportunity to be heard. In that regard, the defendant argues that the court's rulings precluded her from doing so, and she suggests that an examination of the trial transcript bears that out. We have in fact examined that transcript and agree with the defendant.

The trial occurred over three days. The court, on the first day, stated that it "[didn't] want to hear any more about the [Center Avenue properties]" and only "want[ed] to hear about this house [at 21 Plymouth

Avenue]." A fair reading of the transcript discloses that despite that position, the court thereafter heard testimonial evidence and admitted documentary evidence concerning the Center Avenue properties. That, nevertheless, did not advantage the defendant in advancing her counterclaim, as the court still allowed her only to introduce some evidence concerning the Center Avenue properties. That is especially true concerning the defendant's effort to lay out her case as to fraud. Moreover, the court's first "precluding" of evidence on the counterclaim took place before the plaintiff had even rested his case. It is apparent from the transcript that the defendant's counsel was not fully aware[13] that although the court had ruled against his presenting evidence on the counterclaim, the court did from time to time allow the presentation of some evidence. The ambiguous posture of the court in doing so is further blurred by the statement that it was granting the defendant "a little leeway." Thus, the defendant's "presentation" was rendered murkier by the court's comments, more than once, about "dicta." The defendant's counsel protested that he had not been able to "tell the story" and that he was trying "to elicit information on the counterclaim" when the court stated, in overruling the plaintiff's objection to a question, that "[i]n the realm of dicta, this will be dicta on this. I'll let you ask that." Still later, when the plaintiff objected to the defendant's counsel going into the counterclaim, the court overruled the objection "[i]n the hope that there might be some dicta I could enter . . . ." On the final day of trial, near the conclusion, the court stated:

---

[13] The ambivalent posture of certain rulings apparently caused the defendant's counsel to be confused as to how to proceed. For example, on the second day of trial, counsel, apparently in an effort to clarify the procedural posture, inquired of the court whether the counterclaim was denied, and the court stated: "I denied it." Yet, thereafter, evidence was proffered by the defendant as to the counterclaim, some of which was excluded and some of which was heard as "dicta."

"I've heard the whole story, and the foreclosure part remains unanswered, really, but [as to the] remaining story about lots 23 and 29 [on Center Avenue], I'm listening to [it] as dicta. Just . . . do you understand, as dicta, that? I'm listening for it. Okay."

We believe that under the circumstances, the defendant was not permitted to place "the whole story" before the court, even though her counsel more than once had stated his theory for allowing the counterclaim. Early on at the trial, the court definitely knew that the defendant's claim was that the three transfers were a "package deal." The court, however, told the defendant's counsel: "[D]on't . . . don't use that package deal. That's not . . . that's a bad word." At another point, the court told the defendant's counsel: "I wish you'd stop referring to it . . . to it as a package. It wasn't a package. It was a sale of three different . . . properties. There was no package to it." At that juncture, the defendant's counsel appropriately argued that under pleading procedure, he was entitled to present *evidence* on the counterclaim. He argued that this was procedurally correct not only because of the equitable aspect, but also because the plaintiff had never filed any motion to strike or to revise the counterclaim, and never had sought bifurcation.[14] In addition, certain evidence that arguably was relevant on the defendant's

---

[14] By doing so in the middle of the trial, the defendant was, in practical terms, deprived of the right to plead over within fifteen days pursuant to Practice Book § 10-44. In saying that, we are aware that "[i]t is incumbent on a [filing party] to allege some recognizable cause of action . . . . If he fails so to do, it is not the burden of the [opposing party] to attempt to correct the deficiency, either by motion . . . or otherwise." (Internal quotation marks omitted.) *Burke* v. *Avitabile*, 32 Conn. App. 765, 769, 630 A.2d 624, cert. denied, 228 Conn. 908, 634 A.2d 297 (1993). The point is that it is one thing for the plaintiff not to seek to correct such a claimed defect, but it is quite another thing for the court, under the circumstances that existed in this case, to act to the same effect as would a motion to strike in a scenario in which the defendant could have elected under the rule to have fifteen days to plead over. See Practice Book § 10-44.

theory of the case, i.e., her "package" argument encompassing not only the "fraud" thrust of the counterclaim, but also her special defense of fraud to the foreclosure complaint itself, summarily was rejected, and her counsel was cautioned not to offer it again.

A party has the right to present evidence within the acceptable rules supporting its theory of the case. We cannot say that that opportunity was adequately given to the defendant. She claims that the court, in effect, granted a "nonexistent" motion to strike her counterclaim by its summary denial of that pleading. We agree. The hearing of evidence concerning it as "dicta" is puzzling or ambivalent at best. We cannot say that the defendant had the opportunity to present her case even "piecemeal" because to say that fairly implies that all the "pieces" were permitted to be presented. That was not the case, especially as to the issue of the fraud alleged in the counterclaim and specifically pleaded as a special defense to the foreclosure complaint.

One is left with the abiding conviction that in the circumstances previously discussed, the defendant was not given a fair opportunity to be heard on the issues involved. "A fundamental premise of due process is that a court cannot adjudicate any matter unless the parties have been given a reasonable opportunity to be heard on the issues involved . . . and to present evidence and cross-examine adverse witnesses." (Citations omitted.) *Bloom* v. *Zoning Board of Appeals*, 233 Conn. 198, 205, 658 A.2d 559 (1995); *Szot* v. *Szot*, 41 Conn. App. 238, 241, 674 A.2d 1384 (1996). "It is fundamental tenet of due process of law as guaranteed by the fourteenth amendment to the United States constitution and article first, § 10, of the Connecticut constitution that persons whose property rights will be affected by a court's decision are entitled to be heard at a meaningful time and in a meaningful manner. . . . Where a party is not afforded an opportunity to subject the factual determi-

nations underlying the trial court's decision to the crucible of meaningful adversarial testing, an order cannot be sustained." (Internal quotation marks omitted.) *Szot* v. *Szot*, supra, 241–42. The defendant was not given such a reasonable opportunity in this case.

The denial of that opportunity, it is again noted, not only took place in the context of a foreclosure, which is an equitable action, but where the defendant had interposed a special defense of fraud in the foreclosure action itself. The plaintiff glosses over that circumstance and overlooks the fact that the court failed even to refer to that special defense. We conclude, therefore, that the necessary nexus existed such that the complaint and counterclaim were so related that they satisfied the practical test of our transaction rule stated in Practice Book § 10-10. Having satisfied the transaction test, the defendant also is entitled legitimately to invoke equitable relief.

The defendant, parenthetically, not only had tried to get to that issue, but also had prayed for equitable relief in her counterclaim. We will, therefore, turn to well settled principles of equity to aid us in the resolution of this case. The scenario disclosed by this case is amenable to the process that equity may afford. "Courts of equity may grant relief from the operation of a judgment when to enforce it is against conscience, and where the appellant had no opportunity to make defense, or was prevented from so doing by . . . the fraud . . . of the opposite party, and [the appellant was] without fault on his [or her] own part." (Internal quotation marks omitted.) *Cavallo* v. *Derby Savings Bank*, 188 Conn. 281, 284, 449 A.2d 986 (1982). "Foreclosure is peculiarly an equitable action, and the court may entertain such questions as are necessary to be determined in order that *complete justice may be done*." (Emphasis added.) *Hartford Federal Savings & Loan*

*Assn.* v. *Lenczyk,* 153 Conn. 457, 463, 217 A.2d 694 (1966); *Beach* v. *Isacs,* 105 Conn. 169, 176, 134 A. 787 (1926). We have stated that "[b]ecause a mortgage foreclosure action is an equitable proceeding, the trial court may *consider all relevant circumstances to ensure that complete justice is done.*" (Emphasis added.) *Reynolds* v. *Ramos,* 188 Conn. 316, 320, 449 A.2d 182 (1982); *Southbridge Associates, LLC* v. *Garofalo,* 53 Conn. App. 11, 15, 728 A.2d 1114, cert. denied, 249 Conn. 919, 733 A.2d 229 (1999). "Where the plaintiff's conduct is inequitable, a court may withhold foreclosure on equitable considerations and principles." *Southbridge Associates, LLC* v. *Garofalo,* supra, 15; see also *Hamm* v. *Taylor,* 180 Conn. 491, 497, 429 A.2d 946 (1980).

"[E]quitable remedies are not bound by formula but are molded to the needs of justice." *Montanaro Bros. Builders, Inc.* v. *Snow,* 4 Conn. App. 46, 54, 492 A.2d 223 (1985). Our Supreme Court has endorsed the principle that "[a] court of equity does full and equal justice to all having an interest in the subject-matter" by tersely expressing that "[e]quity never does anything by halves." (Internal quotation marks omitted.) *Stolman* v. *Boston Furniture Co.,* 120 Conn. 235, 240, 180 A. 507 (1935); see also *McGaffin* v. *Roberts,* 193 Conn. 393, 404, 479 A.2d 176 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1747, 84 L. Ed. 2d 813 (1985); 27A Am. Jur. 2d 599, Equity § 118 (1996); F. James & G. Hazard, Civil Procedure (3d Ed. 1985) § 10.11, pp. 531–32. It has been appropriately noted that the significance of equity "not doing by halves" means that "it is the aim of equity to have all interested parties in court and to render a complete decree adjusting all rights and protecting the parties against future litigation. . . . The principle of [this] maxim embraces the well-established doctrine . . . that when equity once acquires jurisdiction it will retain it so as to afford complete relief." 30A C.J.S. 337,

Equity § 119 (1992). All the interested parties in court are jurisdictionally available such as to enable equity to render complete relief.

Moreover, it is necessary to keep in mind, particularly in this case, that equity looks to substance and not mere form. *Bender* v. *Bender*, 258 Conn. 733, 751, 785 A.2d 197 (2001); *Connecticut National Bank* v. *Chapman*, 153 Conn. 393, 397, 216 A.2d 814 (1966). In speaking about the meaning and effect of the equitable concept of substance rather than form, Pomeroy, that venerable yet viable authority on equity, opines that it "is one of great practical importance, [which] pervades and affects to a greater or less degree the entire system of equity jurisprudence . . . . Equity always attempts to get at the substance of things, and to ascertain, uphold, and enforce rights and duties which spring from the *real* relations of parties. It will never suffer the mere appearance and external form to conceal the true purposes, objects, and consequences of a transaction." (Emphasis in original.) 2 J. Pomeroy, Equity Jurisprudence (5th Ed. 1941) § 378, pp. 40–41. "In equity, as in law, misrepresentation, to constitute fraud, must be material. . . . That is to say, the representation must prejudice the party relying upon it." (Citations omitted.) *Harper* v. *Adametz*, 142 Conn. 218, 223–24, 113 A.2d 136 (1955).

In summary, we conclude that the defendant was not afforded a reasonable opportunity to present her case of a "package type" transaction despite her reasonable attempt to do so. It is apparent to us that it is required by equity that the complaint and the counterclaim be tried together, as they satisfied not only our transaction test under Practice Book § 10-10, but also the ambit of equity jurisdiction.[15] Complete justice requires that

---

[15] As previously stated, a mortgage foreclosure is an equitable action, and the plaintiff's counterclaim sought equitable relief.

equity grant relief; relief not done by halves, not done in form only, but relief grounded on substance and complete justice. Our Supreme Court has noted aptly that "once any equitable claim has been raised, the court retains its equitable jurisdiction to consider all of the equities before it in order to render complete justice . . . even where the equitable jurisdiction [is] conferred by a defendant's counterclaim." (Citations omitted.) *Fellows* v. *Martin*, 217 Conn. 57, 64–65, 584 A.2d 458 (1991). That illustrates just how far complete equitable jurisdiction can fairly go.

In this case, the defendant appealed from the judgment of strict foreclosure and the denial of her counterclaim. The defendant proposes in her brief, by want of remand, that "the case should be remanded for a whole new trial on all issues because of the exclusion of clearly relevant evidence or, at least, the case should be remanded with direction to permit [her] to amend the counterclaim because, effectively, a motion to strike was granted in the middle of a trial and for the trial court then to determine whether the issues involve the same transaction and should be tried together or separately." Equity requires a new trial on all the issues; the principles previously set forth, applied to the circumstances of this case, mandate equitable relief.

The judgment of strict foreclosure and the denial of the defendant's counterclaim are reversed and the case is remanded for a new trial in which the plaintiff's complaint and the defendant's claim of setoff and her special defenses and counterclaim are to be tried together in the same trial.

In this opinion the other judges concurred.