## NINTH RMA PARTNERS, L.P. *v.* BARRETT L. KRASS ET AL.
## (AC 18106)

Foti, Spear and Vertefeuille, Js.

Argued October 19, 1999—officially released March 21, 2000

*Kerry M. Wisser*, with whom, on the brief, was *Nathan A. Schatz*, for the appellants (defendants).

*Richard M. Levy*, with whom, on the brief, was *Douglas M. Evans*, for the appellee (substitute plaintiff).

*Opinion*

FOTI, J. The defendants[1] appeal from the judgment of the trial court awarding the plaintiff $231,568.62, plus $7500 in attorney's fees. The defendants claim that the trial court improperly (1) concluded that the plaintiff had standing to maintain its action, (2) concluded that the substitute interest rate charged by the plaintiff and its predecessors was reasonable and (3) admitted evidence that did not satisfy the business record exception to the hearsay rule. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. On April 24, 1990, the defendants[2] executed a $150,000 promissory note payable to Landmark Bank (Landmark). On March 28, 1991, Landmark

[1] The defendants in this case are Barrett L. Krass, James Heneghan, James Sutton and Seventeen West Main Street Associates.

[2] The defendants Barrett L. Krass, James Heneghan and James Sutton executed the note on April 24, 1990, and, on that same day, the defendant Seventeen West Main Street Associates guaranteed the repayment of all sums due under the note.

was declared insolvent, and the Federal Deposit Insurance Corporation (FDIC) was appointed as its receiver. On April 14, 1994, the FDIC transferred the note to RMA Partners, L.P. (RMA); RMA then transferred the note to the plaintiff, Ninth RMA Partners, L.P.

On February 6, 1996, the plaintiff filed suit against the defendants to enforce payment of the note.[3] During a December 16, 1996 hearing, the defendants conceded liability on the note. The court, accordingly, rendered summary judgment as to the defendants' liability and set a hearing to resolve the issue of damages. On August 5, 1997, the court held a hearing in damages and on December 1, 1997, rendered judgment awarding damages and attorney's fees to the plaintiff.

I

The defendants first claim that the court improperly ruled that the plaintiff had standing to enforce the note. Resolution of this issue requires the consideration of certain other facts.

On May 30, 1996, the defendants filed a special defense alleging that the plaintiff lacked standing to enforce the note. On December 16, 1996, however, the defendants conceded their liability to the plaintiff and stipulated to the entry of summary judgment as to liability. Although the defendants had conceded liability on the note at the December 16, 1996 summary judgment hearing, they later attempted to deny any liability at the August 5, 1997 hearing in damages. At that hearing, the defendants contested liability by claiming that the plaintiff was not a proper holder of the note and, therefore, lacked the legal standing to enforce it. Specifically, the defendants attempted to raise doubts about the chain of title to the note.

---

[3] The note, by its terms, matured on April 24, 1991. The defendants failed to make payments and, therefore, were in default on the note.

While noting that the defendants had previously conceded liability for the note,[4] the trial court entertained the defendants' argument as to the issue of standing, noting that the issue of standing implicates subject matter jurisdiction and can be raised at any time. In its December 1, 1997 memorandum of decision, the court found that the plaintiff did, in fact, have standing to enforce the note and that the defendants were liable to the plaintiff.

The defendants now appeal, claiming that the trial court improperly found that the plaintiff had standing to enforce the note. The substitute plaintiff, however, claims that the defendants should never have been allowed to raise the issue of standing at the hearing in damages and should not be allowed to raise any issues concerning liability on appeal. Specifically, the substitute plaintiff argues that because the defendants stipulated to liability on the note, they should not have been allowed to contest that liability during the hearing in damages. Of particular note, the substitute plaintiff points to the fact that the defendants initially raised the issue of standing as a special defense, then abandoned that defense by conceding liability on the note and later reintroduced the issue of standing without giving any notice to the plaintiff. As a result, the plaintiff justifiably believed that liability was conclusively established by the summary judgment stipulation and had no notice or opportunity to present more evidence to prove that the plaintiff was a valid holder of the note. Accordingly, the substitute plaintiff argues that the defendants should be precluded from raising any issues relating to liability on appeal.

We agree with the substitute plaintiff that once the defendants conceded liability on the note, it was

---

[4] When the defendant attempted to raise the issue of liability at the August 5, 1997 hearing in damages, the trial court noted: "If we can back up a bit, counsel. . . . Liability, the legal right to collect and the legal responsibility to make payment, has in fact been determined by the court . . . . And liability means that the maker of the note is liable to [the plaintiff] . . . ."

improper for them to attempt to raise the issue of liability at the hearing in damages and in this appeal. The defendants make much of the maxim that standing implicates the subject matter jurisdiction of the court and may be raised at any time. The defendants, however, fail to understand that there is a difference between challenging a party's standing to maintain a cause of action and challenging the merits of the cause of action itself. "The question of standing does not involve an inquiry into the merits of the case. It merely requires the party to make allegations of a colorable claim of injury to an interest which is arguably protected or regulated by the statute . . . in question." *State* v. *Pierson*, 208 Conn. 683, 687, 546 A.2d 268 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989).[5]

When the defendants argued at the hearing in damages that the plaintiff was not a proper holder of the note, their argument went to the merits of the case, that is, to whether the plaintiff should prevail. Although they called their claim a lack of subject matter jurisdiction, we do not view it as such. We view it, instead, as a claim that goes to the heart of the issues that would have had to be resolved if the case had gone to trial. See *State* v. *Seravalli*, 189 Conn. 201, 206, 455 A.2d 852, cert. dismissed, 461 U.S. 920, 103 S. Ct. 2076, 77 L. Ed. 2d 291 (1983) (mere characterization of issue as one of double jeopardy does not require court to grant interlocutory review); see also *State* v. *Gooch*, 186 Conn. 17, 18, 438 A.2d 867 (1982) (putting constitutional tag on

[5] " 'Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented.' " *Monroe* v. *Horwitch*, 215 Conn. 469, 472–73, 576 A.2d 1280 (1990); see *Baker* v. *Carr*, 369 U.S. 186, 204, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962).

nonconstitutional claim will not change its essential character).

To prevail in an action to enforce a negotiable instrument, the plaintiff must be a holder of the instrument or a nonholder with the rights of a holder. See General Statutes § 42a-3-301; *Donnelly* v. *Garvan*, 111 Conn. 626, 629, 151 A. 168 (1930). This status is an element of an action on a note. See 12 Am. Jur. 2d, Bills and Notes § 650 (1997) (action brought on negotiable instrument, such as promissory note, must allege facts on which plaintiff's right to recover from defendant on instrument depends). The failure to plead this fact properly is challenged by a motion to strike. See *Sheiman* v. *Lafayette Bank & Trust Co.*, 4 Conn. App. 39, 42, 492 A.2d 219 (1985). The failure to prove such element will result in a judgment for the defendants. See *Barnes* v. *Upham*, 93 Conn. 491, 495–96, 107 A. 300 (1919). In neither event is jurisdiction implicated.

The trial court, therefore, need not have addressed the defendants' argument, which was, in essence, an effort to undo the stipulation by labeling as jurisdictional a challenge to the merits of the plaintiff's right to recover. Although the issue decided was not a jurisdictional claim and need not have been considered by the court, we note that the court decided the issue correctly.

General Statutes § 42a-1-201 (20) provides in relevant part that a " '[h]older', with respect to a negotiable instrument, means the person in possession . . . in the case of an instrument payable to an identified person, if the identified person is in possession. . . ." When the FDIC took over as Landmark's receiver, the defendants' note was found in Landmark's possession. Because the note was payable to Landmark and Landmark was in possession of the note, Landmark had clearly been the "holder" of the note at the time that the FDIC became

Landmark's receiver.[6] As Landmark's receiver, the FDIC succeeded to all rights, titles, powers and privileges of Landmark. 12 U.S.C. § 1821 (d) (1); see also *Resolution Trust Corp.* v. *Juergens*, 965 F.2d 149 (7th Cir. 1992). The FDIC, therefore, acquired all the rights of a holder. The FDIC then transferred the note to RMA, which acquired the rights of a holder to enforce the note; RMA then transferred the note to the plaintiff, which also succeeded to the rights of a holder and was entitled to enforce the note.

General Statutes § 42a-3-301 provides that a note may be enforced by a holder of the instrument or a nonholder in possession of the instruments who has the rights of a holder. Our review of the record shows that the plaintiff had acquired the rights of a holder and was therefore entitled to enforce the note. The trial court correctly determined that the plaintiff was entitled to bring this action against the defendants.[7]

II

The next issue raised by the defendants concerns the interest rate that the court used to calculate the amount

[6] The defendants argue that Landmark was never actually a "holder" and, therefore, had no standing to enforce the note. The defendants' argument rests on the fact that, when the note was found in Landmark's possession, the note had been endorsed to the Federal Reserve Bank of Boston; the endorsement to the Federal Reserve Bank was subsequently canceled. The defendants should have presented this "chain of title" argument at trial, and it was properly deemed waived by the defendants' concession of liability. As we discussed previously, the plaintiff satisfied the bare requirements of standing by being in possession of the note where the note was made payable to the plaintiff.

[7] We additionally note that General Statutes § 42a-3-308 (b) provides in relevant part that "[i]f the validity of signatures is admitted . . . a plaintiff producing the instrument is entitled to payment . . . unless the defendant proves a defense . . . ." At the summary judgment hearing, the defendants admitted to signing the note. By stipulating to summary judgment, the defendants also waived the opportunity to establish a defense against the plaintiffs. The defendants may not later, under the guise of standing, attempt to litigate an issue that was properly concluded at the summary judgment stage.

owed on the note. Originally, the interest rate on the note was equal to the prime rate of Landmark, plus two percentage points. When Landmark became insolvent, however, its internal prime rate index ceased to exist. Thus, the plaintiff and its predecessors on the note necessarily implemented a substitute interest rate. The defendants now claim that the court improperly determined that that substitute interest rate was reasonable.

It is well established that "[w]hen a variable interest rate is based on the rate of a failed institution, the trial court must determine whether the substitute rate is reasonable by examining the documents and testimony offered by the plaintiff." *Central Bank* v. *Colonial Romanelli Associates*, 38 Conn. App. 575, 578, 662 A.2d 157 (1995). In determining reasonableness, the court need not determine the exact methodology used by the failed bank in calculating its internal interest rate; such a determination would be impossible in many circumstances. Rather, the court must determine whether the substitute rate was reasonable based on all the circumstances of the particular case.

In the present case, the court determined that the substitute rate assessed by the plaintiff and its predecessors was reasonable. In doing so, the court examined the actual rates used by Landmark prior to its failure and the substitute rates set by the FDIC. The court then compared those rates to the federal prime rate set by the Federal Reserve. After considering all the relevant evidence, the court properly determined that the substitute rate was fair and reasonable, and we find no error in the court's determination that the substitute rate was reasonable.

### III

The defendants next claim that the trial court improperly admitted two exhibits into evidence under the business record exception to the hearsay rule. Specifically,

the defendant claims that the court improperly admitted exhibit two, the commercial loan trial balance of Landmark, and exhibit six, a printout of information from the FDIC's computer system showing general account information on the defendants' loan. For the following reasons, we find that the court did not act improperly in admitting either of the two exhibits.

## A

Exhibit two is a computer printout containing information on the defendants' loan that had been stored in Landmark's computer system. When Landmark failed and the FDIC was appointed as its receiver, Landmark's computers were used to print the document to provide the FDIC with a hard copy of the loan data stored on Landmark's computers. Over the defendants' objection, the court admitted exhibit two into the record under the business record exception to the hearsay rule. On appeal, the defendants claim that exhibit two does not satisfy the business record exception and that it was not properly authenticated. We disagree with the defendants.

"To admit evidence under the business record exception to the hearsay rule, a trial court judge must find that the record satisfies each of the three conditions set forth in General Statutes § 52-180. The court must determine, before concluding that it is admissible, that the record was made in the regular course of business, that it was in the regular course of such business to make such a record, and that it was made at the time of the act described in the report, or within a reasonable time thereafter." (Internal quotation marks omitted.) *River Dock & Pile, Inc.* v. *O & G Industries, Inc.*, 219 Conn. 787, 793–94, 595 A.2d 839 (1991). To qualify a document as a business record, the party offering the evidence must present a witness who testifies that these three requirements have been met. *State* v. *Tillman,*

220 Conn. 487, 506, 600 A.2d 738 (1991), cert. denied, 505 U.S. 1207, 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992). Section 52-180 is to be liberally construed, and our review is limited to determining whether the trial court abused its discretion in admitting the challenged evidence. *River Dock & Pile, Inc.* v. *O & G Industries, Inc.*, supra, 795.

The defendants claim that exhibit two does not fall within the scope of § 52-180 because the computer printout was produced upon the failure of Landmark. The defendants note that because it is not the "normal course of business" for banks to fail, the printout fails according to the first two requirements of § 52-180. In making this argument, however, the defendants fail to recognize that it is the computer information itself, and not the printout, that must qualify as a business record. The plaintiff presented evidence that it was within the normal course of business for Landmark to compile data on its outstanding loans; this information was processed and stored in Landmark's computer system. While the printout itself may have been generated upon the failing of Landmark, the printout was merely a tangible manifestation of information stored on the computer system. The actual records themselves, which were stored in the computer system, were clearly created within the regular course of Landmark's business and satisfy the requirements of § 52-180.

The second issue the defendants raise with respect to exhibit two is that the exhibit was not properly authenticated. We find no merit in the defendants' claim. At the hearing in damages, the plaintiff presented testimony from two witnesses who were intimately familiar with Landmark's procedures regarding commercial loans. In fact, one of the witnesses was actually present when the document was created. We find that there was sufficient evidence for the trial court to have determined that exhibit two was a properly authenti-

cated business record of Landmark; the court's admission of this evidence was not improper.

## B

Finally, the defendants claim that the court improperly admitted exhibit six, which is a printout of information from the FDIC's computer system showing general account information on the defendants' loan from 1991 through 1994, the period during which the FDIC held the note. The defendants claim that exhibit six does not satisfy the requirements of the business record exception because it was not made in the normal course of business and was generated only in anticipation of litigation. To support their claim, the defendants point to the fact that although the FDIC held the note between 1991 and 1994, the printout was not created until 1997, and only at the request of the plaintiff.

Once again, the defendants confuse the distinction between computer records and the physical printout of such records. It is undisputed that the FDIC generated the actual printout long after it was a holder of the note. Thus, the printout itself was not created within the FDIC's normal course of business. Nevertheless, the exhibit was properly admitted as a business record because it reflected information compiled by the FDIC during the time it held the note. As holder of the note between 1991 and 1994, it was clearly within the ordinary course of the FDIC's business to compile data on the outstanding balance of the defendants' note. The printout admitted as exhibit six was merely a hard copy of data that had already been compiled by the FDIC in the ordinary course of its business. The fact that the information was printed in hard copy only *after* the FDIC had transferred the note does not change the fact that the actual information reflected in that printout was created by the FDIC in the normal course of business while it held the note.

Similarly, the fact that the printout was created by the FDIC for purposes of litigation does not prevent the document from being admitted as a business record. We, of course, agree with the defendants that documents prepared for purposes of litigation lack the presumption of trustworthiness that justifies the business record exception. See, e.g., *Connecticut Bank & Trust Co., N.A.* v. *Reckert*, 33 Conn. App. 702, 710, 638 A.2d 44 (1994). The actual data reflected by exhibit six, however, was not compiled for the purposes of litigation. Rather, it was produced during the normal course of the FDIC's business. The printout admitted as exhibit six was merely the physical representation of data that already existed on the FDIC's computer system. There was sufficient evidence presented to show that that information was created in the normal course of the FDIC's business, and the exhibit was properly admitted by the trial court.

The judgment is affirmed.

In this opinion the other judges concurred.