MONETARY FUNDING GROUP, INC. *v.*
JOHN PLUCHINO
(AC 24677)

Lavery, C. J., and Schaller and Bishop, Js.

Argued November 18, 2004—officially released February 15, 2005

*Nathalie Feola-Guerrieri*, with whom, on the brief, was *Daniel Shepro*, for the appellant (plaintiff).

*Janine M. Becker*, for the appellee (defendant).

*Opinion*

SCHALLER, J. The plaintiff, Monetary Funding Group, Inc., appeals from the judgment of the trial court, rendered after a trial to the court, in favor of the defendant, John Pluchino. On appeal, the plaintiff claims that the court improperly (1) determined that it had unclean hands, (2) determined that it had made an unconscionable loan, (3) determined that it had violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and (4) imposed a remedy precluding it from collecting principal and interest. We affirm the judgment of the trial court.

The court found the following facts relevant to the plaintiff's appeal. In the spring of 2000, the defendant, who previously had owned and operated a gasoline station and radiator business for more than thirty years, sought to obtain financing to purchase a convenience store and Laundromat business (business). He applied for a loan from a bank, but was turned down as a result of concerns regarding the stability of the new restaurant with which he had replaced his radiator business.

The defendant, who was not represented by counsel, contacted Paul Dwyer, the president of the plaintiff corporation. He informed Dwyer that he needed to borrow $20,000 in order to purchase the business. On April 13, 2000, the defendant executed a ninety day promissory note in favor of the plaintiff, secured by a mortgage on the defendant's unencumbered property located at 621 Washington Avenue in Bridgeport. The interest rate disclosed on the ninety day note was 15 percent. Additional terms included a $3000 origination fee, a $400 processing fee, $937.50 in prepaid interest, $550 for attorney's fees and $112.50 for a courier fee. In short, the defendant incurred a liability of $25,000 and received a net amount from the note of $20,000. The plaintiff also indicated an annual percentage rate of 28 percent.[1] After ninety days, the loan was to be restructured through a refinancing into an installment loan. Dwyer was aware that the defendant lacked any other means to repay the note, except for refinancing at the conclusion of the ninety days. Dwyer planned to broker the second loan for the benefit of the defendant and receive additional broker fees.

In January, 2001, approximately five months after the defendant had defaulted on the note, the plaintiff

---

[1] Aslan Lodi, an officer at the department of banking, testified that the "[a]nnual percentage rate is a blended rate which included certain fees and points . . . to show the actual cost of borrowing." Lodi then stated that the actual annual percentage rate for the ninety day note was approximately 85 percent.

located a lender willing to refinance the defendant's debt. At the closing, the defendant, for the first time, learned that it consisted of an $80,000 loan from an entity known as InterBay Funding. According to the proposed terms of the second loan, the defendant would receive only $38,721.25 of the $80,000. A total of $28,678.31 would pay off the original note to the plaintiff, which also would receive a broker fee of $4800. In summary, considering both the original $25,000 note and the second proposed loan in the amount of $80,000, the defendant would receive in hand $58,721.25 and incur up-front costs of $21,278.75 ($5000 for the first transaction and $16,278.75 for the second transaction).

The defendant expressed concerns regarding the $80,000 loan. He requested time to have an attorney review the proposed arrangement, but was told that was not necessary. The defendant, already in default with respect to the original note, never executed the second loan, nor did he ever repay the original note. The plaintiff commenced the present foreclosure action on April 23, 2001. In its prayer for relief, the plaintiff sought a judgment of strict foreclosure.[2] The defendant answered the complaint and, on April 10, 2002, set forth eleven special defenses[3] and a counterclaim alleging a

[2] The plaintiff sought the following in its prayer for relief. "1. Foreclosure by sale if, at the time of entry of judgment, the United States of America is a party Defendant herein; otherwise, strict foreclosure of Plaintiff's mortgage. 2. Reasonable attorney's fees. 3. Receiver of rents. 4. Possession of said premises. 5. A deficiency judgment. 6. Such other and further relief as in equity may appertain."

[3] The court described the defendant's special defenses as "overlapping and redundant . . . ." It specifically found that the defendant had failed to sustain his burden of proof with respect to the defense of a violation of the implied covenant of good faith and fair dealing. We note that "special defenses and counterclaims alleging a breach of an implied covenant of good faith and fair dealing . . . are not equitable defenses to a mortgage foreclosure. . . . Accordingly, the defendants' special defense is legally insufficient and is not a valid legal or equitable defense to a foreclosure action." (Internal quotation marks omitted.) Barasso v. Rear Still Hill Road, LLC, 81 Conn. App. 798, 807 n.5, 842 A.2d 1134 (2004).

The court also rejected the defendant's special defense of unclean hands

CUTPA violation. The court found that the defendant had demonstrated that the plaintiff had unclean hands and that the loan transaction was unconscionable. Additionally, it found in favor of the defendant with respect to the CUTPA counterclaim and awarded attorney's fees in the amount of $6750. This appeal followed. Additional facts will be set forth as necessary.

As a general matter, we note that it is well established in our jurisprudence that "[f]oreclosure is peculiarly an equitable action, and the court may entertain such questions as are necessary to be determined in order that *complete justice may be done*. . . . [B]ecause a mortgage foreclosure action is an equitable proceeding, the trial court may consider *all relevant circumstances to ensure that complete justice is done*." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Morgera* v. *Chiappardi*, 74 Conn. App. 442, 456–57, 813 A.2d 89 (2003); see also *Northeast Savings, F.A.* v. *Hintlian*, 241 Conn. 269, 275, 696 A.2d 315 (1997); *Moasser* v. *Becker*, 78 Conn. App. 305, 324, 828 A.2d 116, cert. denied, 266 Conn. 910, 832 A.2d 70 (2003). Foreclosure may be withheld by the court on the grounds of equitable considerations and principles. *LaSalle National Bank* v. *Freshfield Meadows, LLC*, 69 Conn. App. 824, 833, 798 A.2d 445 (2002). With those legal principles in mind, we turn to the plaintiff's specific claims.

I

The plaintiff first claims that the court improperly determined that it had unclean hands. Specifically, the

on the basis that the plaintiff was an "oppressive bargainer." The defendant abandoned the special defense of unconscionability on the ground that the plaintiff had paid taxes owed on the mortgaged property for the sole purpose of reaping the benefit of the high interest on the note.

Finally, the court denied the defendant's special defenses that alleged CUTPA violations, ruling, on the basis of several trial court opinions, that a CUTPA violation cannot be asserted as a special defense.

plaintiff argues that several of the court's factual findings were clearly erroneous and that the court improperly applied the doctrine of unclean hands. We are not persuaded.

The starting point for the resolution of that issue is the determination of the appropriate standard of review. We turn to our Supreme Court's decision in *Thompson* v. *Orcutt*, 257 Conn. 301, 777 A.2d 670 (2001), for guidance in resolving that issue. In *Thompson*, our Supreme Court stated: "[A]pplication of the doctrine of unclean hands rests within the sound discretion of the trial court. . . . The exercise of [such] equitable authority . . . is subject only to limited review on appeal. . . . The only issue on appeal is whether the trial court has acted unreasonably and in clear abuse of its discretion. . . . In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of [the trial court's] action. . . . *Whether the trial court properly interpreted the doctrine of unclean hands, however, is a legal question distinct from the trial court's discretionary decision whether to apply it.*" (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 308. Similarly, we have stated that "[t]he question of whether the clean hands doctrine may be applied to the facts found by the court is a question of law. . . . We must therefore engage in a plenary review to determine whether the court's conclusions were legally and logically correct and whether they are supported by the facts appearing in the record." (Citation omitted.) *McKeever* v. *Fiore*, 78 Conn. App. 783, 787–88, 829 A.2d 846 (2003). The court's factual findings underlying the special defense of unclean hands, however, are reviewed pursuant to the clearly erroneous standard. See *Willow Funding Co., L.P.* v. *Grencom Associates*, 63 Conn. App. 832, 840, 779 A.2d 174 (2001).

We reiterate that foreclosure is an equitable action. "Our jurisprudence has recognized that those seeking equitable redress in our courts must come with clean hands. The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue. . . . For a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with clean hands. . . . The clean hands doctrine is applied not for the protection of the parties but for the protection of the court. . . . It is applied . . . for the advancement of right and justice. . . . The party seeking to invoke the clean hands doctrine to bar equitable relief must show that his opponent engaged in wilful misconduct with regard to the matter in litigation. . . . The trial court enjoys broad discretion in determining whether the promotion of public policy and the preservation of the courts' integrity dictate that the clean hands doctrine be invoked." (Citation omitted; internal quotation marks omitted.) *Ridgefield* v. *Eppoliti Realty Co.*, 71 Conn. App. 321, 334–35, 801 A.2d 902, cert. denied, 261 Conn. 933, 806 A.2d 1070 (2002).

The court found the following facts that, in toto, support a determination that the plaintiff had unclean hands.[4] Despite the fact that the note was a commercial transaction, the defendant was an unsophisticated borrower[5] and was unrepresented by counsel. The plaintiff

[4] The court stated that "[i]n the instant case, the *totality* of the circumstances precludes the court from finding that the plaintiff's conduct was fair, equitable and honest." (Emphasis in original; internal quotation marks omitted.)

[5] The defendant testified that the highest level of school that he had completed was his junior year of high school. Furthermore, he stated that although he had owned and operated several businesses, he had no prior experience in obtaining a commercial mortgage. Finally, the defendant testified that a representative of the plaintiff, Al Goodale, who was a social acquaintance, had told him that Dwyer would give him a favorable rate on a loan.

charged an arbitrarily high annual percentage rate and misrepresented the rate to the defendant. Dwyer testified that he arbitrarily charged the defendant a 15 percent origination fee in the amount of $3000, which was significantly higher than the 2 to 6 percent customarily applied to commercial loans. The plaintiff failed to conduct a "bona fide evaluation" of the defendant's ability to repay the loan, and Dwyer conceded that he was aware that repayment by the defendant was impossible, but for a subsequent refinancing. Last, the plaintiff, knowing the defendant's dire financial situation with respect to the note, did not offer him an opportunity to discuss or to evaluate the terms of the second loan. In short, the court found that the plaintiff misled the defendant, who thought he was borrowing a net of $20,000 in exchange for fees totaling $4000 to $5000 when, in reality, the terms consisted of an $80,000 loan, with the defendant receiving approximately $59,000 and the plaintiff and InterBay Funding receiving approximately $21,000 in fees.[6] The court specifically credited the defendant's testimony that Dwyer had represented that the fees would not exceed the $4000 to $5000 range. "The court finds that the reasonable implication from the evidence is that the transaction was structured by the plaintiff for its own benefit in order for it to acquire an origination fee, a loan processing fee, as well as a finder's fee, all of which the plaintiff could not have demanded as part of a single loan transaction." Essentially, the court found a single transaction that required two steps to completion: first, the initial ninety day note for $20,000 and second, the refinancing that consisted of an $80,000 loan for the purpose of maximizing fees for the plaintiff.

---

[6] At oral argument before this court, counsel for the plaintiff represented that some of the fees generated by the second loan would be divided between InterBay Funding and the plaintiff.

## A

The plaintiff challenges certain of the court's factual findings. We apply the clearly erroneous standard of review to those challenges. First, the plaintiff argues that contrary to the court's memorandum of decision, there was evidence as to why the transaction was structured so that a refinancing would be necessary. According to the plaintiff, the defendant was unable to obtain a bank loan because his restaurant business was not yet established. That claim, however, fails to account for the testimony of the defendant that he sought to borrow only $20,000 to purchase the business. Although he discussed a subsequent purchase of the buildings that would require an additional $80,000, at the time of the loan, the defendant requested only the $20,000 loan. Moreover, the clear import of the defendant's testimony, which the court credited, was his belief that the plaintiff would simply turn the existing note into a monthly installment loan, not obtain funds from a new lender, with all of the accompanying fees and costs. Further, the defendant testified that he relied on Dwyer's representation that the only costs associated with borrowing the $20,000 consisted of the $4000 to $5000 in fees that the two had discussed. We cannot say that finding was clearly erroneous.

The plaintiff also argues that there was no evidence that the defendant was able to obtain an installment loan. There was evidence that the defendant's application to a bank had been denied. The defendant, however, testified that there were no time constraints on when the purchase of the businesses was to occur. Thus, the defendant had no immediate need for the funds that would warrant the exorbitant fees generated by the plaintiff's proposed two step transaction. We conclude, therefore, that there was evidence in the record to support the findings underlying the special

defense of unclean hands and, accordingly, that they were not clearly erroneous.

## B

The plaintiff also claims that on the basis of the facts found by the court, the doctrine of unclean hands was applied improperly. That claim implicates the plenary standard of review. The court stated that "[u]nder these particular circumstances, where the borrower was unsophisticated, was misled and was unquestionably unable to comply with the terms of the note, the plaintiff has attempted to take advantage of [the defendant] in order to charge arbitrarily high fees as part of a transaction structured by the plaintiff precisely for [that] purpose. The court's enforcement of this loan according to its terms would involve the court in this unfair transaction in a manner that would run afoul of the unclean hands doctrine."

We have reviewed the entire record before us. It demonstrates that the defendant has shown successfully that the plaintiff engaged in intentional misconduct with respect to the various transactions in order to obtain excessive fees and costs, as well as to foreclose on the Washington Avenue property. On that basis, particularly with respect to the facts that we have set forth, we determine that the court properly concluded that the plaintiff violated the clean hands doctrine because his conduct was not fair, equitable and honest. See *Barasso* v. *Rear Still Hill Road, LLC*, 81 Conn. App. 798, 806 n.4, 842 A.2d 1134 (2004). Accordingly, the court's application of the unclean hands doctrine was legally and logically correct and supported by the record.

## II

The plaintiff next claims that the court improperly determined that it made an unconscionable loan. Specif-

ically, the plaintiff argues that several of the court's factual findings underlying that determination were clearly erroneous. We disagree.

"Our first consideration is the standard of review for a claim of unconscionability. [T]he question of unconscionability is a matter of law to be decided by the court based on all the facts and circumstances of the case. . . . Our review on appeal is not limited to determining whether there has been clear error. . . . [T]he ultimate determination of whether a transaction is unconscionable is a question of law, not a question of fact, and . . . the trial court's determination on that issue is subject to a plenary review on appeal. *It also means, however, that the factual findings of the trial court that underlie that determination are entitled to the same deference on appeal that other factual findings command.* Thus, those findings must stand unless they are clearly erroneous. . . . .

"The purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise. . . . As applied to real estate mortgages, the doctrine of unconscionability draws heavily on its counterpart in the Uniform Commercial Code which, although formally limited to transactions involving personal property, furnishes a useful guide for real property transactions. . . . As Official Comment 1 to § 2-302 of the Uniform Commercial Code suggests, [t]he basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. . . . Unconscionability is determined on a case-by-case basis, taking into account all of the relevant facts and circumstances." (Citations omitted; emphasis added; internal quotation marks omitted.) *Family Financial Services, Inc.* v. *Spencer,* 41 Conn. App. 754, 762–63, 677 A.2d 479 (1996);

see also *Cheshire Mortgage Service, Inc.* v. *Montes*, 223 Conn. 80, 87–89, 612 A.2d 1130 (1992). Because the plaintiff has challenged only the factual findings that relate to the court's finding of unconscionability, we employ the clearly erroneous standard of review.

The plaintiff again argues that there was no evidence that the defendant was misled that the cost of refinancing the note would not exceed $5000. We already have rejected that argument. The plaintiff also claims that the defendant's failure to complain at the closing about the amount of the loan indicated that he wanted the loan. The plaintiff contends that the defendant objected only to the cost and fees associated with the second part of the transaction, and not the actual amount offered. That argument fails to account for the direct testimony of the defendant, who stated that although that amount was discussed in a preliminary fashion, he wanted to borrow only $20,000 until he determined the viability of the businesses. The court was free to accept that testimony. See *Clennon* v. *Hometown Buffet, Inc.*, 84 Conn. App. 182, 187–88, 852 A.2d 836 (2004). Accordingly, we cannot say that the court's underlying factual findings with respect to unconscionability were clearly erroneous.

### III

The plaintiff next claims that the court improperly determined that it violated CUTPA. Specifically, the plaintiff argues that the court's finding of a CUTPA violation, as alleged in the defendant's counterclaim, was based on improper findings of unclean hands and an unconscionable transaction. In parts I and II, we determined that the court properly applied the doctrines of unclean hands and unconscionability and, accordingly, the plaintiff's argument with respect to the CUTPA counterclaim must fail.

"Connecticut courts, when determining whether a practice violates CUTPA, will consider (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen). . . . Thus, a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . Whether a practice is unfair and thus violates CUTPA is an issue of fact. . . . The facts found must be viewed within the context of the totality of circumstances which are uniquely available to the trial court." (Internal quotation marks omitted.) *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 433–34, 849 A.2d 382 (2004). Additionally, our Supreme Court has stated that "[a]ll three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." (Internal quotation marks omitted.) *Journal Publishing Co.* v. *Hartford Courant Co.*, 261 Conn. 673, 695–96, 804 A.2d 823 (2002).

In the present case, the court determined that the plaintiff acted with unclean hands and engaged in an unconscionable transaction. The conduct of the plaintiff, therefore, was unfair, oppressive and unscrupulous, and constituted a violation of CUTPA. Accordingly, the court awarded the defendant $6750 in attorneys' fees.

On appeal, the plaintiff challenges only the court's conclusions with respect to the special defenses of unclean hands and unconscionability. Because we have already determined that the court properly resolved those issues, the plaintiff's challenge to the judgment on the CUTPA counterclaim must also fail.

## IV

The plaintiff's final claim is that the court improperly imposed a remedy precluding it from collecting principal and interest on the $20,000 note. Specifically, the plaintiff argues that it is entitled to recover the balance of the note plus interest. We disagree.

At the outset of our discussion, we note that "[p]leadings have their place in our system of jurisprudence. While they are not held to the strict and artificial standard that once prevailed, we still cling to the belief, even in these iconoclastic days, that no orderly administration of justice is possible without them. . . . The purpose of a complaint or counterclaim is to limit the issues at trial, and such pleadings are calculated to prevent surprise. . . . *It is fundamental in our law that the right of a [party] to recover is limited to the allegations in his [pleading].* . . . Facts found but not averred cannot be made the basis for a recovery. . . . Thus, it is clear that [t]he court is not permitted to decide issues outside of those raised in the pleadings. . . . A judgment in the absence of written pleadings defining the issues would not merely be erroneous, it would be void." (Citation omitted; emphasis added; internal quotation marks omitted.) *Breiter* v. *Breiter*, 80 Conn. App. 332, 335–36, 835 A.2d 111 (2003). Put another way, "[t]he principle that a *plaintiff may rely only upon what he has alleged is basic. . . . It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint.*"

(Emphasis added; internal quotation marks omitted.) *Wright* v. *Hutt*, 50 Conn. App. 439, 449, 718 A.2d 969, cert. denied, 247 Conn. 939, 723 A.2d 320 (1998).

In the present case, the only count in the plaintiff's complaint sought to foreclose the defendant's property. The plaintiff elected the equitable proceeding of foreclosure rather than to pursue an action at law for the amount due on the note. "It is well established . . . that the [mortgagee] is entitled to pursue its remedy at law on the notes, or to pursue its remedy in equity upon the mortgage, or to pursue both. A note and a mortgage given to secure it are separate instruments, executed for different purposes and in this State action for foreclosure of the mortgage and upon the note are regarded and treated, in practice, as separate and distinct causes of action, although both may be pursued in a foreclosure suit." (Internal quotation marks omitted.) *L & R Realty* v. *Connecticut National Bank*, 53 Conn. App. 524, 550, 732 A.2d 181, cert. denied, 250 Conn. 901, 734 A.2d 984 (1999); see also *Ankerman* v. *Mancuso*, 271 Conn. 772, 781, 860 A.2d 244 (2004). In the present case, the plaintiff failed to bring an action at law as to the note and sought, instead, the equitable proceeding of foreclosure. On that basis, the court was limited either to foreclose the property in favor of the plaintiff or to find in favor of the defendant. The issue of whether an appropriate remedy would include repayment of the loan plus the interest simply was not before the court. The plaintiff is not entitled to a remedy that it did not plead.

The judgment is affirmed.

In this opinion the other judges concurred.