## EMIGRANT MORTGAGE COMPANY, INC. *v.* WALTER D'AGOSTINO (AC 25939)

Lavery, C. J., and Schaller and Berdon, Js.*

---

\* The listing of judges reflects their status on this court as of the date of oral argument.

Argued September 22, 2005—officially released April 18, 2006

*Brendan J. O'Rourke*, with whom, on the brief, was *Marianne F. Murray*, for the appellant (defendant).

*Robert A. Ziegler*, with whom, on the brief, were *Leslee B. Hill* and *Jeffrey M. Knickerbocker*, for the appellee (plaintiff).

*Opinion*

SCHALLER, J. The defendant, Walter D'Agostino, appeals from the judgment of foreclosure by sale, rendered by the trial court, in favor of the plaintiff, Emigrant Mortgage Company, Inc. On appeal, the defendant claims that the court improperly (1) concluded that the plaintiff satisfied a condition precedent to commencing the foreclosure action and (2) admitted an exhibit into evidence that was neither a business record nor properly authenticated. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to the defendant's appeal. On June 26, 2001, the defendant executed an adjustable rate note in favor of the plaintiff in the amount of $2,025,000, secured by a mortgage on property known as One Ivanhoe Lane in Greenwich. The plaintiff is the owner of both the note and the mortgage.

Section two of the adjustable rate note set the defendant's annual interest rate at 6.75 percent. Section two also explained that the interest rate was subject to change in accordance with § 4 of the note and included the last sentence, "[t]he interest rate required by . . . Section 2 and Section 4 of this Note is the rate [the defendant] will pay both before and after any default described in Section 7 (B) of this note." Section 4 (D) addressed the limits on interest rate changes and specifically provided that the defendant's interest rate "will never be greater than 12.750%." On the same day that the defendant executed the note and mortgage, he also signed a default interest rate rider. The rider replaced the last sentence of § 2 of the note, established the

default interest rate as 18 percent and incorporated the mortgage by reference.[1]

On July 5, 2002, the plaintiff notified the defendant, by way of letter, that he was in default under the terms of the note and mortgage. The default notice specified that to cure the default and to reinstate the mortgage, the defendant would be required to pay $54,731.36. That amount was calculated, in part, on the basis of the 18 percent default interest rate. More than two months later, on September 9, 2002, the plaintiff initiated this action to foreclose the mortgage. The plaintiff subsequently filed an amended complaint alleging that the defendant had been in default of payment since June 1, 2002. On May 2, 2003, the defendant filed an amended answer, which admitted the execution of the note and mortgage and asserted five special defenses, namely, duress, unconscionability, equitable estoppel, unclean hands and lack of proper notice of default or acceleration.

The first four of the defendant's special defenses primarily challenged the propriety of calculating the reinstatement amount on the basis of the 18 percent default interest rate. On the first day of trial, however, the plaintiff orally and in writing, waived its right to collect the default interest rate of 18 percent. Instead, the plaintiff agreed to calculate the default debt at 6.75 percent interest, the rate set forth in § 2 of the adjustable rate note.[2] In its September 17, 2004 memorandum of decision, the court acknowledged that because the plaintiff waived its right to interest payments calculated

---

[1] The default interest rate rider states in relevant part: "The last sentence of Paragraph 2 of the note is hereby deleted and the following provisions are substituted in its place in the Note, and added to the Mortgage or Security Agreement."

[2] The plaintiff claimed that it waived this right in an effort to streamline the trial.

at the 18 percent default interest rate, the defendant's first four special defenses were no longer applicable.

With respect to the remaining special defense of lack of proper notice of default or acceleration, the court concluded that the defendant had received notice of the default, the right to reinstate and acceleration. The court explained: "First, the plaintiff presented a very credible witness, Patricia Gilligan, an assistant vice president, who testified that notice of default, etc., was mailed to the defendant on or about July 5, 2002, by certified and regular mail at his home at One Ivanhoe Lane, Greenwich. Second, the return receipt was signed by 'Inga,' who was admittedly a housekeeper for the defendant at the time of the notice, and the notice sent by regular mail was never returned. Third, the defendant agreed that he knew he was in default and talked to bank officers at the time regarding the situation. Fourth, the defendant was not in a financial position to reinstate the mortgage and, even if he had not received notice of the right to reinstate, it would have made no difference." The court concluded, therefore, that the plaintiff was entitled to a foreclosure of its mortgage and that the defendant had failed to prove any of its special defenses. Consequently, the court ordered a foreclosure by sale and appointed a committee to sell the subject property. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that, by issuing a defective default notice, the plaintiff failed to satisfy a condition precedent to commencing the foreclosure action. The defendant also claims that the plaintiff acted unconscionably and with unclean hands.[3] We disagree.

[3] In addition, the defendant contends that the default notice was defective in that the reinstatement amount was inaccurate and unsubstantiated. "To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support

A

We first address the defendant's claim that the July 5, 2002 default notice was defective. Specifically, the defendant argues that the default notice failed to comply with the notice provisions of the mortgage, and contravened the terms of the note and mortgage.[4] The defendant asserts that the notice provision of the mortgage contained express language that entitled him to specific information regarding default and the manner in which to cure default. The defendant further contends that the July 5, 2002 default notice did not comply with these provisions because it instructed that the defendant would be required to pay a reinstatement amount based, in part, on the 18 percent default interest rate. According to the defendant, use of the 18 percent default interest rate was improper because § 4 (D) of the note set 12.75 percent as the absolute cap on the interest rate. The defendant argues that the plaintiff's default notice was predicated on a "grossly inaccurate calculation" and, therefore, that the plaintiff failed to meet the condition precedent required for bringing the foreclosure action. We conclude that the default notice complied with the notice provisions and did not contravene the terms of the note and mortgage.

At the outset, we note that "[i]t is well established that [n]otices of default and acceleration are controlled

it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Cornfield Point Assn.* v. *Old Saybrook*, 91 Conn. App. 539, 564, 882 A.2d 117 (2005). At trial, the plaintiff provided testimony from the manager of its foreclosure department regarding the manner by which the reinstatement amount was calculated, as well as a printed breakdown of the calculation method. The court was free to find this evidence credible.

[4] On appeal, it is not disputed that the plaintiff gave notice of default to the defendant prior to accelerating the mortgage debt and commencing its foreclosure action. There is also no dispute that the default notice demanded payment of a reinstatement amount that incorporated the 18 percent default interest rate.

by the mortgage documents. Construction of a mortgage deed is governed by the same rules of interpretation that apply to written instruments or contracts generally, and to deeds particularly. The primary rule of construction is to ascertain the intention of the parties. This is done not only from the face of the instrument, but also from the situation of the parties and the nature and object of their transactions. . . . A promissory note and a mortgage deed are deemed parts of one transaction and must be construed together as such. . . .

"In construing a deed, a court must consider the language and terms of the instrument as a whole. . . . Moreover, the words [in the deed] are to be given their ordinary popular meaning, unless their context, or the circumstances, show that a special meaning was intended. . . .

"A promissory note is nothing more than a written contract for the payment of money, and, as such, contract law applies. . . . In construing a contract, the controlling factor is normally the intent expressed in the contract, not the intent which the parties may have had or which the court believes they ought to have had. . . . Where . . . there is clear and definitive contract language, the scope and meaning of that language is not a question of fact but a question of law. . . . In such a situation our scope of review is plenary, and is not limited by the clearly erroneous standard. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." (Citations omitted; internal quotation marks omitted.) *Fidelity Bank* v. *Krenisky*, 72 Conn. App. 700, 706–707, 807 A.2d 968, cert. denied, 262 Conn. 915, 811 A.2d 1291 (2002).

"Notice provisions in mortgage documents usually require default notices to contain specific information,

which serves a very clear and specific purpose; it informs mortgagors of their rights so that they may act to protect them. Therefore, when the terms of the note and mortgage require notice of default, proper notice is a condition precedent to an action for foreclosure." (Internal quotation marks omitted.) Id., 710. Consequently, we must determine whether such a condition precedent was satisfied in the present case.

Paragraph twenty-two of the mortgage sets forth, in clear and unambiguous terms, the notice provisions. It states in relevant part: "Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant . . . . The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date that notice is given to Borrower, by which the default must be cured; and (d) failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by the Security Agreement and foreclosure or sale of the Property."

The defendant's argument depends on the existence of ambiguity among the relevant documents and is based on the claim that he was misinformed regarding "the action required to cure the default . . . ." The record, however, reveals no ambiguity. Although § 4 (D) of the note does establish an interest rate cap of 12.75 percent, the court correctly acknowledged that the cap only "applies when interest is current on this variable rate note." The default interest rate rider, which the defendant signed on the same day as the note and mortgage, expressly replaced the last sentence of § 2, which established the defendant's interest rate before and after default as that required by § 2 and § 4 of the note. By way of substitution, and in contrast to § 4 (D), the default interest rate rider expressly referred to interest in the event of a default and established the default interest rate as 18 percent. In addition, it is

undisputed, not only that the defendant signed the default interest rate rider, but that, prior to closing, the defendant also signed a mortgage commitment letter disclosing that he would be charged 18 percent in the event of default. Finally, as the court pointed out, "[t]he defendant acknowledged that he had the advice of his own counsel at the time he signed the default rider." Because the relevant documents are not ambiguous, we conclude that the default notice was proper and did not contravene the note and the mortgage.

### B

The defendant also claims that the default notice was improper on equitable grounds. Specifically, the defendant argues that a default interest rate of 18 percent is "grossly punitive" and that this fact, coupled with the plaintiff's abandonment of its right to collect on the 18 percent at the commencement of trial, indicates that the plaintiff acted unconscionably and with unclean hands. We disagree.

### 1

The defendant first contends that a default interest rate of 18 percent is unconscionable. In addressing his claim, "[o]ur first consideration is the standard of review for a claim of unconscionability. [T]he question of unconscionability is a matter of law to be decided by the court based on all the facts and circumstances of the case. . . . Our review on appeal is not limited to determining whether there has been clear error. . . . [T]he ultimate determination of whether a transaction is unconscionable is a question of law, not a question of fact, and . . . the trial court's determination on that issue is subject to a plenary review on appeal. It also means, however, that the factual findings of the trial court that underlie that determination are entitled to the same deference on appeal that other factual findings

command. Thus, those findings must stand unless they are clearly erroneous. . . .

"The purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise. . . . As applied to real estate mortgages, the doctrine of unconscionability draws heavily on its counterpart in the Uniform Commercial Code which, although formally limited to transactions involving personal property, furnishes a useful guide for real property transactions. . . . As Official Comment 1 to § 2-302 of the Uniform Commercial Code suggests, [t]he basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. . . . Unconscionability is determined on a case-by-case basis, taking into account all of the relevant facts and circumstances." *Monetary Funding Group, Inc.* v. *Pluchino*, 87 Conn. App. 401, 411–12, 867 A.2d 841 (2005).

It is axiomatic that "[t]he purpose of a special defense is to plead facts that are consistent with the allegations of the complaint but demonstrate, nonetheless, that the plaintiff has no cause of action. . . . A valid special defense at law to a foreclosure proceeding must be legally sufficient and address the making, validity or enforcement of the mortgage, the note or both." (Internal quotation marks omitted.) *Fidelity Bank* v. *Krenisky*, supra, 72 Conn. App. 705–706. In the present case, the court expressly held that the defendant had failed to prove any of his special defenses and correctly noted that the defendant did not cite any authority to support his special defense that a default interest rate of 18 percent was unconscionable. Moreover, the defendant did not provide any expert testimony on this point, and it was uncontested at trial that the defendant had the advice of counsel when he agreed to the default interest

rate. Consequently, because "[t]he party claiming unconscionability bears the burden of proof"; *Emlee Equipment Leasing Corp.* v. *Waterbury Transmission, Inc.*, 31 Conn. App. 455, 464, 626 A.2d 307 (1993); the defendant's bald assertion of unconscionability, without more, was insufficient to establish that the default interest rate of 18 percent was unconscionable.

2

We next turn to the defendant's claim that the plaintiff acted with unclean hands by pursuing a claim for default interest at the rate of 18 percent, thereby leading the defendant to believe that payment of significant amounts of interest would be required to reinstate the mortgage, and then abandoning that claim on the first day of trial. We disagree.

In *Thompson* v. *Orcutt*, 257 Conn. 301, 777 A.2d 670 (2001), our Supreme Court stated: "[A]pplication of the doctrine of unclean hands rests within the sound discretion of the trial court. . . . The exercise of [such] equitable authority . . . is subject only to limited review on appeal. . . . The only issue on appeal is whether the trial court has acted unreasonably and in clear abuse of its discretion. . . . In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of [the trial court's] action. . . . Whether the trial court properly interpreted the doctrine of unclean hands, however, is a legal question distinct from the trial court's discretionary decision whether to apply it." (Citations omitted; internal quotation marks omitted.) Id., 308.

Similarly, we have stated that "[t]he question of whether the clean hands doctrine may be applied to the facts found by the court is a question of law. . . . We must therefore engage in a plenary review to determine whether the court's conclusions were legally and logically correct and whether they are supported by the

facts appearing in the record. . . . The court's factual findings underlying the special defense of unclean hands, however, are reviewed pursuant to the clearly erroneous standard. . . .

"We reiterate that foreclosure is an equitable action. Our jurisprudence has recognized that those seeking equitable redress in our courts must come with clean hands. The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue. . . . For a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with clean hands. . . . The clean hands doctrine is applied not for the protection of the parties but for the protection of the court. . . . It is applied . . . for the advancement of right and justice. . . . The party seeking to invoke the clean hands doctrine to bar equitable relief must show that his opponent engaged in wilful misconduct with regard to the matter in litigation. . . . The trial court enjoys broad discretion in determining whether the promotion of public policy and the preservation of the courts' integrity dictate that the clean hands doctrine be invoked." (Citations omitted; internal quotation marks omitted.) *Monetary Funding Group, Inc.* v. *Pluchino*, supra, 87 Conn. App. 406–407.

Although the court, in its memorandum of decision, did not specifically address the defendant's special defense of unclean hands, it did hold that "[t]he defendant has failed to prove any of [his] special defenses." The court necessarily concluded, therefore, that the defendant had failed to introduce evidence to support his special defense of unclean hands. Accordingly, we review the court's factual findings underlying the special defense of unclean hands pursuant to the clearly erroneous standard. In the present case, although the

defendant questioned the plaintiff's sole witness regarding the plaintiff's reason for withdrawing its claim for 18 percent default interest, the defendant did not present any evidence to directly support his argument that the plaintiff had acted with unclean hands. More importantly, the defendant, in his posttrial briefs, did not cite any authority or reference any evidence to support his argument. In contrast, the plaintiff's posttrial brief asserted that its claim for 18 percent default interest was abandoned in an effort to streamline the trial. The court, therefore, was free to conclude that the plaintiff did not engage in wilful misconduct with regard to the matter in litigation. That conclusion was not clearly erroneous. We conclude, therefore, that the court did not abuse its discretion in determining that the defendant did not prove his special defense of unclean hands.

II

The defendant's final claim is that the court improperly admitted into evidence a document offered to show the manner in which the reinstatement amount was calculated. On appeal, the defendant contends that the document was not a proper business record and was not authenticated properly.[5] We disagree.

The following additional facts are necessary for our resolution of the defendant's claim. On the first day of trial, March 23, 2004, the plaintiff called Gilligan, an assistant vice president and the manager of its foreclosure department. Gilligan testified that she was the principal person to calculate the numbers supporting the plaintiff's claims against the defendant. She further testified that she personally used the bank's computer

---

[5] The defendant also contends that the document should have been excluded because it was not provided to the defendant until March 24, 2004, the day it was offered. This argument, however, neglects the fact that the document was created in response to the defendant's March 23, 2004 cross-examination of Gilligan. As such, this does not constitute a trial by ambush situation.

system to produce several documents attempting to substantiate the plaintiff's claims, and she demonstrated through her testimony personal knowledge of the bank's general record keeping procedures.

During cross-examination of Gilligan, the defendant's counsel questioned her regarding the specific manner in which the reinstatement amount was calculated. Following her testimony, Gilligan contacted the plaintiff's mortgage accounting department and requested that it produce documentation setting forth exactly how the reinstatement amount was calculated. On the second day of trial, the plaintiff recalled Gilligan and attempted to offer this document into evidence. Gilligan testified that she personally requested that the calculation be prepared and that the document contained a specific breakdown as to how the reinstatement amount was derived. Gilligan also testified that it was in the course of the plaintiff's business to create and to keep such a document, that this particular document was created in the course of the plaintiff's business with regard to the defendant's loan and that the document was made contemporaneously with her request for the defendant's records. During voir dire by the defendant's counsel, Gilligan acknowledged that she did not know whether the information contained on the document was stored on a software program or what computer entries the mortgage department used to produce the document. The defendant challenged its admissibility by claiming that the proper foundation had not been established. The court overruled the objection, concluding that the document qualified as a business record, and admitted the document into evidence.

A

We first consider whether the plaintiff established a sufficient foundation to qualify the document as a business record admissible under the hearsay exception

contained in General Statutes § 52-180.[6] We note at the outset that "[i]t is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *Margolin* v. *Kleban & Samor, P.C.*, 275 Conn. 765, 779–80, 882 A.2d 653 (2005).

"To admit evidence under the business record exception to the hearsay rule, a trial court judge must find that the record satisfies each of the three conditions set forth in General Statutes § 52-180. The court must determine, before concluding that it is admissible, that the record was made in the regular course of business, that it was in the regular course of such business to make such a record, and that it was made at the time of the act described in the report, or within a reasonable time thereafter. . . . To qualify a document as a business record, the party offering the evidence must present a witness who testifies that these three requirements have been met." (Citation omitted; internal quotation marks omitted.) *Ninth RMA Partners,*

---

[6] General Statutes § 52-180 provides in relevant part: "(a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter.

"(b) The writing or record shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the writing or record, or who have personal knowledge of the act, transaction, occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of the evidence, but not to affect its admissibility. . . ."

*L.P.* v. *Krass*, 57 Conn. App. 1, 9, 746 A.2d 826, cert. denied, 253 Conn. 918, 755 A.2d 215 (2000); see also Conn. Code Evid. § 8-3 (7).

"Section 52-180 is to be liberally construed [in favor of admissibility], and our review is limited to determining whether the trial court abused its discretion in admitting the challenged evidence." *Ninth RMA Partners, L.P.* v. *Krass*, supra, 57 Conn. App. 10. A liberal interpretation of § 52-180 is supported by its express terms, which provide that a record "shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the writing or record, or who have personal knowledge of the act, transaction, occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of the evidence, but not to affect its admissibility." General Statutes § 52-180 (b).[7] In addition, the witness need not have been employed by the organization during the relevant time period, and "[t]here is no requirement in § 52-180 . . . that the documents must be prepared by the organization itself to be admissible as that organization's business records." (Internal quotation marks omitted.) *New England Savings Bank* v. *Bedford Realty Corp.*, 246 Conn. 594, 603, 717 A.2d 713 (1998). This liberal application is derived from the recognition that the trustworthiness of such documents comes from their being used for business purposes and not for litigation. Id., 600.

---

[7] Indeed, the proponent of a business record need not even prove the accuracy of the record in order for it to be admitted. Its accuracy is an issue for the trier of fact. *State* v. *Waterman*, 7 Conn. App. 326, 341–42, 509 A.2d 518 ("there is no requirement that the accuracy of a business record be proved as a prerequisite to its admission"), cert. denied, 200 Conn. 807, 512 A.2d 231 (1986).

Furthermore, "evidence is not inadmissible because the business record is created, stored or produced by means of computer technology. . . . When computer records are offered as evidence, the proponent must satisfy a two part test. In addition to meeting the three requirements of the business records exception to the hearsay rule . . . the proponent also must establish that the basic elements of the computer system are reliable." (Citations omitted.) *Federal Deposit Ins. Corp.* v. *Carabetta*, 55 Conn. App. 369, 376, 739 A.2d 301, cert. denied, 251 Conn. 927, 742 A.2d 362 (1999).

In *American Oil Co.* v. *Valenti*, 179 Conn. 349, 361, 426 A.2d 305 (1979), our Supreme Court concluded that a person who used computer records and had only an indirect role in their production was competent to testify that the records were made in the ordinary course of business. See *Federal Deposit Ins. Corp.* v. *Carabetta*, supra, 55 Conn. App. 376 ("witness' personal knowledge goes to the weight of the evidence, not to its admissibility"). In *American Oil Co.*, the defendant challenged the admissibility of computer printouts summarizing the state of a debtor's accounts with the plaintiff. *American Oil Co.* v. *Valenti*, 355. In admitting the printouts, the trial court relied on the testimony of a sales manager who held a supervisory position over the debtor's account. Id., 357. Despite the fact that the sales manager did not personally participate in preparing the printouts or even use a computer, our Supreme Court affirmed the admission of the printouts on the basis that the sales manager had personal knowledge of the accounts in question derived from his position as account supervisor and had experience with record keeping procedures. Id., 361.

In *Federal Deposit Ins. Corp.* v. *Carabetta*, supra, 55 Conn. App. 369, our Supreme Court stated: "Trial courts must have considerable latitude in determining the admissibility of evidence in [the area of computer gener-

ated business records] as in others. . . . We are not prepared to identify with precision what status in a particular company's hierarchy a witness must have in order to be sufficiently knowledgeable to testify about computer records. Section 52-180 expressly allows business records to be admitted despite the absence of testimony from the person or persons who made the writing or record, or who [had] personal knowledge of the act, transaction, occurrence or event recorded. This language is helpful in clarifying that it is not necessary to produce as a witness the [data entry clerk] who actually entered information into the computer or the programmer who designed the processing program. . . . What is crucial is not the witness' job description, but rather her knowledge of the basic elements that afford reliability and trustworthiness to computer generated data." (Citations omitted; internal quotation marks omitted.) Id., 376–77. Furthermore, "[r]outinely prepared records . . . are well recognized exceptions to the hearsay rule, because their regular use in the business of the company insures a high degree of accuracy. Proof of day-to-day business reliance upon computerized records should therefore make less onerous the burden of laying a proper foundation for their admission." (Internal quotation marks omitted.) *State* v. *Swinton*, 268 Conn. 781, 807, 847 A.2d 921 (2004).

In this case, Gilligan's testimony satisfied the elements of trustworthiness required by § 52-180 as well as the requirements pertaining to computer generated business records. Gilligan testified that it was in the regular course of the plaintiff's business to create such a document and that it was generated in the regular course of the plaintiff's business. She also stated that the document was created contemporaneously with her request for the defendant's records. Furthermore, Gilligan testified that the document contained an exact breakdown of how the reinstatement sum was calcu-

lated and thoroughly explained that calculation. Moreover, like the sales manager in *American Oil Co.,* Gilligan had personal knowledge of the facts and circumstances surrounding the defendant's mortgage that was derived from her position as supervisor of the bank's foreclosure department, and had personal experience with the plaintiff's general record keeping procedures. We conclude that the court did not abuse its discretion and that Gilligan's testimony sufficed to meet the plaintiff's burden to establish a sufficient foundation.

### B

Having concluded that the document was properly admitted into evidence, we next must determine whether it was properly authenticated. The question is whether a business record may be admitted even though the qualifying witness lacks personal knowledge of its creation. We conclude that the exhibit was properly authenticated.

"Authentication is . . . a necessary preliminary to the introduction of most writings in evidence . . . . A proponent may authenticate a document by demonstrating proof of authorship of, or other connection with, [such] writings. . . . In general, a writing may be authenticated by a number of methods, including direct testimony, circumstantial evidence or proof of custody. . . .

"The requirements for authenticating a business record are identical to those for laying a foundation for its admissibility under the hearsay exception. It is generally held that business records may be authenticated by the testimony of one familiar with the books of the concern, such as a custodian or supervisor, who has not made the record or seen it made, that the offered writing is actually part of the records of the business." (Citations omitted; internal quotation marks omitted.)

*New England Savings Bank* v. *Bedford Realty Corp.*, supra, 246 Conn. 604.

As we stated in part II A, Gilligan's testimony established the basis for admitting the exhibit under the business records exception to the hearsay rule and our case law pertaining to computer generated business records. Accordingly, we conclude that the exhibit was properly admitted into evidence as a business record and properly authenticated.

The judgment is affirmed and the case is remanded for the purpose of setting a new sale date.

In this opinion the other judges concurred.

—————
* The listing of judges reflects their status on this court as of the date of oral argument.