******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# OCWEN LOAN SERVICING, LLC *v.*
# SANDRA A. SHELDON ET AL.
## (AC 43704)

Bright, C. J., and Alexander and Suarez, Js.

*Syllabus*

The plaintiff, O Co., sought to foreclose a mortgage on certain real property owned by the defendants, S and J. S and J originally signed a promissory note to G Co., secured by a mortgage on the property, and further agreed to participate in a "bisaver program," through which they made a payment to G Co. every two weeks via a direct withdrawal by G Co. from S's checking account. G Co. ceased withdrawing payments in 2008, and reported S and J, who had neither requested nor authorized the cessation, as delinquent to several credit reporting agencies, which severely damaged S and J's credit. S and J thereafter reached an oral agreement with G Co., pursuant to which G Co. agreed to "restore" their credit. G Co. did not restore their credit, S and J ceased to make additional payments, and G Co. resumed reporting S and J as delinquent to the credit agencies. Subsequently, G Co. assigned the note to O Co. S and J asserted several special defenses to the foreclosure action, including unclean hands. Thereafter, P Co. was substituted as the plaintiff. The trial court concluded that S and J had satisfied their burden of proof on their special defense of unclean hands and rendered judgment in their favor, finding that they had equitable title to the property. On P Co.'s appeal to this court, *held*:

1. The trial court's finding that G Co. did not restore S and J's credit was not clearly erroneous: the court credited J's testimony that G Co. never sent letters to the credit reporting agencies in order to correct its error and restore S and J's credit, which supported the finding that G Co. did not restore their credit, and the court was not required to credit evidence submitted by P Co., including three letters that P Co. claimed demonstrated that G Co. had restored S and J's credit; moreover, this court declined to review P Co.'s unpreserved claim that the court relied on J's testimony in contravention of the best evidence rule, as P Co. did not object to J's testimony that G Co. and O Co. failed to restore S and J's credit, and J's testimony that G Co. did not send letters to the credit reporting agencies was based on his firsthand observations.

2. The trial court properly balanced the equities in concluding that P Co.'s legal title to the property was unenforceable after finding for S and J on their special defense of unclean hands.

   a. The trial court properly applied the doctrine of unclean hands: the court concluded that G Co.'s failure to take payments from S and J and to restore S and J's credit after erroneously reporting them to be in default caused their credit to be destroyed; moreover, the court's findings that G Co.'s conduct was wilful and that S and J came to the court with clean hands were not clearly erroneous, as G Co. voluntarily reported S and J's nonpayment, caused by G Co.'s failure to withdraw payments, to the credit reporting agencies, and the court credited J's testimony that G Co. failed to send letters to restore S and J's credit; furthermore, the court's finding that S and J's economic downfall was caused by G Co. was not clearly erroneous, as evidence presented linked S and J's economic difficulties to G Co.'s actions in failing to restore their credit, including J's testimony that G Co. had not attempted to restore S and J's credit but, instead, had continued to report nonpayment to the credit reporting agencies for more than ten years, and P Co.'s argument that the ruination of S and J's credit was unconnected to G Co.'s error in failing to withdraw the payments was based on the incorrect premise that G Co. had acted to restore S and J's credit.

   b. The trial court did not abuse its discretion in determining that a reasonable balancing of the equities weighed in favor of S and J's equitable title to the property: the court considered all relevant factors and found that S and J's economic downfall was a greater inequity than their failure to make a payment on the note in more than ten years; moreover, the remedy ordered by the court did not eliminate S and J's obligations

under the note or hold that P Co. may not pursue its legal remedy to enforce the note, but merely held that P Co. was not entitled to the equitable remedy of foreclosure.

Argued February 10—officially released October 5, 2021

*Procedural History*

Action to foreclose a mortgage on certain real property owned by the defendants, and for other relief, brought to the Superior Court in the judicial district of Windham, where PHH Mortgage Corporation was substituted as the plaintiff; thereafter, the case was tried to the court, *Hon. Leeland J. Cole-Chu*, judge trial referee; judgment for the defendants, from which the substitute plaintiff appealed to this court. *Affirmed.*

*Jordan W. Schur*, for the appellant (substitute plaintiff).

*Opinion*

ALEXANDER, J. In this foreclosure action, the substitute plaintiff, PHH Mortgage Corporation, appeals from the judgment of the trial court rendered in favor of the defendants, Sandra A. Sheldon and James J. Sheldon. On appeal, the substitute plaintiff claims that, in concluding that the defendants prevailed on their special defense of unclean hands, the court (1) made a clearly erroneous factual finding that a predecessor of the substitute plaintiff failed to "restore" the defendants' credit following its own error, and (2) improperly determined that the balancing of the equities prevented foreclosure. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, as found by the trial court, and procedural history are relevant. On September 24, 2007, the defendants signed a promissory note in which they promised to pay $182,000, plus interest, to GMAC Mortgage, LLC (GMAC). The note was secured by a mortgage to Mortgage Electronic Registration Systems, Inc. (MERS),[1] as nominee for GMAC. Part of the property that is the subject of the mortgage and this foreclosure action is located in Killingly (Killingly property). The other portion of the property is located in Foster, Rhode Island. Only a foreclosure on the Killingly property was sought in the present case.

Shortly after the note was executed, the defendants accepted GMAC's offer of a " 'bisaver program' " wherein payments would be made on the loan every two weeks by direct withdrawal from Sandra Sheldon's checking account. In or about August, 2008, for reasons that remain unexplained, GMAC ceased withdrawing the biweekly payments as the defendants had authorized it to do. The substitute plaintiff and GMAC admitted that the nonpayment of the loan was GMAC's fault. The court determined that there was no evidence that, had GMAC continued to withdraw the authorized biweekly payments, there would have been any interruption in the defendants' payments. Although the missed payments were a result of GMAC's failure to withdraw those payments, GMAC, nevertheless, reported the absence of the payments to several credit reporting agencies. The court found that, as a result, the defendants' credit was "damaged quickly" and eventually was "destroyed." Soon after GMAC stopped withdrawing the payments and began reporting the resultant missed payments as a default on the part of the defendants, James Sheldon's credit cards were cancelled. Because James Sheldon needed at least one open credit card account for travel related expenses in order to fulfill the duties of his employment in multistate construction management, he could not continue such work, and his income dropped dramatically.

The defendants filed complaints with the Rhode

Island Department of Business Regulation, Division of Banking (department) in 2008 and 2009. An officer with the department told GMAC that it " 'screwed up and you gotta fix it.' " Bryan Duggan, a GMAC representative, acknowledged GMAC's error in failing to withdraw the loan payments, but GMAC continued to send regular reports to credit reporting agencies that the defendants were in default. On July 14, 2009, an oral agreement was reached between the defendants and GMAC, wherein the defendants agreed to bring the loan current and make three additional regular monthly payments, and GMAC agreed to restore the defendants' credit. The defendants satisfied the October, 2008 through July, 2009 loan payments in July, 2009, and made three additional mortgage payments, with the last one being in December, 2009. James Sheldon testified that, because the defendants did not believe that GMAC had performed its obligation to restore their credit, they made no additional mortgage payments thereafter. As a result of the defendants' refusal to make additional mortgage payments, GMAC resumed reporting to credit agencies by early 2010, that the defendants were delinquent in their mortgage payments.

On August 20, 2010, GMAC assigned the mortgage to Ocwen Loan Services, LLC (Ocwen). Although James Sheldon explained the situation to Ocwen, it refused to do anything to restore the defendants' credit or to take into account the effect that GMAC's errors had on the defendants' credit and income. Ocwen continued to send reports of the defendants' nonpayment of the mortgage to credit reporting agencies. At least one credit reporting agency reported the defendants as having no credit rating at all, which fact prevented them from obtaining a Veterans Administration refinancing loan.

In 2017, Ocwen commenced this foreclosure action against the defendants.[2] In its amended complaint, Ocwen alleged that the defendants had defaulted on their mortgage payment due on November 1, 2009, and every month thereafter. Ocwen alleged that, as a result, it had elected to accelerate the balance due on the note and to foreclose on the mortgage on the Killingly property. The defendants, who were self-represented throughout the proceedings in the trial court, filed an answer and asserted special defenses, including unclean hands.[3] Ocwen assigned the note and mortgage to the substitute plaintiff and filed a motion to substitute PHH Mortgage Corporation as the plaintiff, which was granted by the court.[4]

Following trial, the court issued a memorandum of decision on October 18, 2019, in which it concluded that the defendants had satisfied their burden of proof of their special defense of unclean hands. The court credited James Sheldon's testimony. It determined that the defendants' original default was GMAC's fault due

to its failure to take biweekly mortgage payments and that GMAC reported, without justification, these nonpayments to credit reporting agencies as the defendants' fault. The court further found that GMAC failed to restore the defendants' credit, thereby causing the defendants' credit to be destroyed, and rendering James Sheldon unable to continue his career in multistate construction management.

In balancing the equities, the court found for the defendants on the issue of liability and concluded that the substitute plaintiff's legal title to the property was unenforceable. It found that the defendants had equitable title subject to legal title being quieted in them by agreement or by a separate action. This appeal followed.[5] Following the filing of the present appeal, the substitute plaintiff filed a motion for articulation, which the trial court granted. Additional facts will be set forth as necessary.

Because the substitute plaintiff's claims on appeal center on the unclean hands doctrine, we note at the outset the following relevant legal principles. "Our jurisprudence has recognized that those seeking equitable redress in our courts must come with clean hands. The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue. . . . For a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with clean hands. . . . The clean hands doctrine is applied not for the protection of the parties but for the protection of the court. . . . It is applied . . . for the advancement of right and justice. . . . The party seeking to invoke the clean hands doctrine to bar equitable relief must show that his opponent engaged in wilful misconduct with regard to the matter in litigation. . . . The trial court enjoys broad discretion in determining whether the promotion of public policy and the preservation of the courts' integrity dictate that the clean hands doctrine be invoked." (Internal quotation marks omitted.) *Monetary Funding Group, Inc.* v. *Pluchino*, 87 Conn. App. 401, 407, 867 A.2d 841 (2005).

## I

The substitute plaintiff first claims that the court's finding that GMAC did not restore the defendants' credit is clearly erroneous. It argues that the defendants "presented no credible evidence that [the] credit reporting was *not* corrected as agreed." (Emphasis in original.) We are not persuaded.

"[W]hen reviewing findings of fact, we defer to the trial court's determination unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing

court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Under the clearly erroneous standard of review, a finding of fact must stand if, on the basis of the evidence before the court and the reasonable inferences to be drawn from that evidence, a trier of fact reasonably could have found as it did." (Internal quotation marks omitted.) *Wells Fargo Bank*, *N.A.* v. *Lorson*, 183 Conn. App. 200, 210, 192 A.3d 439, cert. granted, 330 Conn. 920, 193 A.3d 1214 (2018).

The substitute plaintiff challenges the court's decision to credit James Sheldon's testimony that GMAC did not restore his credit. Specifically, it argues that James Sheldon did not testify as to what GMAC failed to do to restore his credit, but testified only that GMAC failed to fix his credit "to my satisfaction and my wife's satisfaction." James Sheldon did not, as the substitute plaintiff contends, testify that GMAC failed to restore his credit only because it did not fix his credit to his undefined "satisfaction." His testimony was that GMAC did not restore his credit at all because it did not send letters to credit reporting agencies in order to correct its mistake and restore the defendants' credit. He testified that he brought the loan current and made the additional loan payments as requested by GMAC, but that GMAC "never followed through."[6] James Sheldon testified that GMAC did not send letters to the credit reporting agencies, questioning, "[W]hy would they not do this? It corrects everything. And really maybe eight, fifty cent stamps is all it's gonna cost 'em, that's all. GMAC didn't do it . . . ." He further stated that, "when Ocwen had the chance, they didn't feel like generating eight letters either . . . ." James Sheldon argued that, as of July 31, 2009, he never again heard from the executive officers at GMAC despite that "[i]t's probably eight letters, three credit bureaus and five creditors, and they just walked away."[7] The court, as was within its province to do, credited the testimony of James Sheldon that GMAC did not restore his credit. See *Gianetti* v. *Norwalk Hospital*, 304 Conn. 754, 772–73, 43 A.3d 567 (2012) (it is within province of trier of fact to weigh evidence presented and determine credibility).

The substitute plaintiff contends that James Sheldon's two credit denial letters from 2019, which were admitted as full exhibits at trial, had no bearing on the status of the defendants' credit in 2009, but rather related to the defendants' failure to make any payments in the following eight years. Regardless of whether these credit denial letters relate to GMAC's failure to restore the defendants' credit, James Sheldon's testimony supports the court's finding that GMAC did not restore the defendants' credit. See, e.g., *Wells Fargo Bank*, *N.A.* v. *Lorson*, supra, 183 Conn. App. 210 (finding of fact is clearly erroneous when there is *no* evidence in record to support it).

The substitute plaintiff argues that the court's factual finding, in reliance on James Sheldon's testimony, was clearly erroneous because the uncontroverted documentary evidence proved that GMAC met its obligation to restore the defendants' credit rating. In particular, the substitute plaintiff relies on three letters that it claims show that GMAC had restored the defendants' credit in accordance with the verbal agreement. The first letter, which was dated July 27, 2009, and which was addressed to the defendants from Duggan, stated that GMAC "sent an *amendment* to the four credit reporting agencies for the [September, 2008] through [the June, 2009] payments. These payments will reflect as paid within the month due. The credit report will reflect no late payments since the loan origination in [September, 2007]." (Emphasis added.) The letter further stated that the defendants "may use this letter for verification, should you need to provide a potential credit grantor with proof that this correction is in [progress]." A second letter, dated July 31, 2009, sent from Duggan to the defendants, stated that the $13,544.06 that was received on July 23, 2009, was applied to the October, 2008 through July, 2009 payments and that "the credit has been *amended* to reflect no late payments on the account. A letter will be sent under separate cover to be used for potential creditors." (Emphasis added.) In a third letter, dated March 13, 2012, to the department, Duggan stated that GMAC had "received complaints filed with your office by the [defendants] in 2008 and 2009," and that "[i]n [July, 2009], [the defendants] remitted funds to satisfy the [October, 2008] through [July, 2009] payments. . . . A recent review of the information reported by the credit bureaus reflects no late payments on the account prior to August 1, 2009, which was the agreement reached . . . ."

The substitute plaintiff contends that the July 27, 2009 letter informs the defendants that credit reporting amendments were sent to the credit reporting agencies and that the credit reporting would be corrected to show the loan as paid from September, 2008 through July, 2009. The substitute plaintiff contends that the July 31, 2009 letter confirms the removal of the negative credit reporting for the defendants and that the March 12, 2012 letter further demonstrates that the defendants' credit was restored upon receipt of the defendants' three payments. It further argues that the department must have agreed that GMAC met its obligation to the defendants because it took no further action on the defendants' complaint.

The court was not convinced that the letters to which the substitute plaintiff directs our attention demonstrated that GMAC had restored the defendants' credit. It determined that, in the letters, GMAC only "claimed to send correcting credit reports to credit reporting agencies, but all that the evidence shows it actually

did is to place the burden of fixing their credit on the defendants: it gave the defendants a letter acknowledging its error and saying the defendants could use it to try to restore their credit." The court stated that, "[a]part from submitting GMAC correspondence using the word 'amendment' instead of 'correction,' the [substitute] plaintiff offered no direct evidence of any such 'amendment .' . . ." In its articulation, the court stated, "[T]he evidence showed that GMAC claimed that it sent 'corrective credit reporting' . . . not that it actually did so." [8] It was within the province of the court not to credit the letters and the testimony of the substitute plaintiff's witness as having established that GMAC had restored the defendants' credit and instead to credit the testimony of James Sheldon that GMAC and its successors in interest never restored the defendants' credit rating.

The substitute plaintiff argues that, in accordance with the best evidence rule, the defendants should have produced credit reports to refute the letters it presented, which demonstrated that the defendants' credit had been restored. It contends that in light of the defendants' failure to do so, the court should have concluded that GMAC had restored the defendants' credit. The substitute plaintiff misunderstands the best evidence rule. The rule does not prevent the court from relying on evidence that has been admitted before it. Instead, it is a ground on which a party may rely to object to the admission of evidence because other evidence is preferable. See *State* v. *Carter*, 151 Conn. App. 527, 537–38, 95 A.3d 1201 (2014), appeal dismissed, 320 Conn. 564, 132 A.3d 729 (2016). Significantly, the substitute plaintiff did not object to James Sheldon's testimony that GMAC and Ocwen failed to restore the defendants' credit rating. Thus, its claim that the court should not have relied on this evidence because it was not the best evidence of whether GMAC performed its obligation to restore the defendants' credit rating was not properly preserved and, therefore, is unreviewable. See, e.g., *State* v. *Warren*, 83 Conn. App. 446, 451, 850 A.2d 1086 (unpreserved evidentiary claims are not reviewable on appeal), cert. denied, 271 Conn. 907, 859 A.2d 567 (2004). In any event, we note that the rule, nevertheless, is inapplicable. "[T]he best evidence rule requires a party to produce an original writing, if it is available, when the terms of that writing are material and must be proved." (Emphasis omitted; internal quotation marks omitted.) *Cadle Co.* v. *Errato*, 71 Conn. App. 447, 452, 802 A.2d 887, cert. denied, 262 Conn. 918, 812 A.2d 861 (2002); see also E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 10.1.2, p. 697 ("The Best Evidence Rule is a rule of preference, not one of exclusion. Thus, it prefers proof by the original document but will accept oral evidence if necessary."). The disputed issue regarding whether GMAC restored the defendants' credit was not something that was

reduced to a writing. Rather, James Sheldon's statements that GMAC did not send letters to his credit agencies is based on his firsthand observations. "Where one testifies to what he has seen or heard, such testimony is primary evidence regardless of whether such facts are reduced to writing." (Internal quotation marks omitted.) *Coelm* v. *Imperato*, 23 Conn. App. 146, 150, 579 A.2d 573, cert. denied, 216 Conn. 823, 581 A.2d 1054 (1990).

We also reject the argument of the substitute plaintiff that the department concluded that GMAC had met its obligation to fix the defendants' credit rating. The absence of evidence before the court regarding the outcome of the defendants' complaint that was filed with the department does not indicate whether or how it resolved the complaint. Although the court could have drawn the inference the plaintiff advocates for on appeal, it was not required to do so. James Sheldon, whose testimony the court credited, explained that he followed the advice of the department and entered into an agreement with GMAC but that GMAC never followed through in sending the letters to restore his credit.

We will not second-guess the court's decision to credit James Sheldon's testimony or its decision not to credit GMAC's representation in the letters of what steps it purportedly took to restore the defendants' credit. See *Gianetti* v. *Norwalk Hospital*, supra, 304 Conn. 772–73 (appellate court must defer to fact finder's assessment of credibility). For the foregoing reasons, we conclude that the court's finding that GMAC did not restore the defendants' credit is not clearly erroneous.

II

The substitute plaintiff next claims that the court improperly balanced the equities in concluding that its legal title was unenforceable after finding for the defendants on their special defense of unclean hands. We are not persuaded.

A

This claim contains various subarguments in which the substitute plaintiff challenges the court's underlying factual findings and legal application of the unclean hands doctrine. Our standard of review is as follows. "[A]pplication of the doctrine of unclean hands rests within the sound discretion of the trial court. . . . The exercise of [such] equitable authority . . . is subject only to limited review on appeal. . . . The only issue on appeal is whether the trial court has acted unreasonably and in clear abuse of its discretion. . . . In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of [the trial court's] action. . . . Whether the trial court properly interpreted the doctrine of unclean hands, however, is a legal question distinct from the trial

court's discretionary decision whether to apply it. . . . [T]he question of whether the clean hands doctrine may be applied to the facts found by the court is a question of law. . . . We must therefore engage in a plenary review to determine whether the court's conclusions were legally and logically correct and whether they are supported by the facts appearing in the record." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Monetary Funding Group, Inc.* v. *Pluchino*, supra, 87 Conn. App. 406.

1

The substitute plaintiff contends that the court improperly determined that it engaged in misconduct despite the defendants "hav[ing] not shown fraud or other inequitable or illegal conduct on the part of [the] plaintiff . . . ." It contends, citing *LaSalle National Bank* v. *Freshfield Meadows, LLC*, 69 Conn. App. 824, 798 A.2d 445 (2002) (*LaSalle*), that "[s]ituations where the plaintiff refused to accept payments postcommencement of foreclosure [were] not deemed unclean hands by this [c]ourt."

In *LaSalle*, this court concluded that the unclean hands doctrine was not applicable where the plaintiff bank did not accept payments, which had been made by the defendant after indebtedness was accelerated due to the defendant's default, because it was not required to do so pursuant to the note or mortgage. *LaSalle National Bank* v. *Freshfield Meadows, LLC*, supra, 69 Conn. App. 835–36. Those facts are markedly different from the facts in the present case, wherein it was GMAC's failure to withdraw the authorized payments from Sandra Sheldon's bank account and where GMAC, prior to default, ruined the defendants' credit as a result. There is no rigid formula for what constitutes misconduct, rather, to constitute misconduct it must be "of such a character as to be condemned and pronounced wrongful by honest and fair-minded people . . . ." (Internal quotation marks omitted.) *Thompson* v. *Orcutt*, 257 Conn. 301, 310, 777 A.2d 670 (2001). In our exercise of plenary review, we determine that the court properly applied the doctrine of unclean hands to the facts of the present case when it determined that GMAC failed to take loan payments from the defendants and failed to restore the defendants' credit after it erroneously reported the defendants' to be in default, thereby causing the defendants' credit to be destroyed.

2

The substitute plaintiff next argues that the court's finding that its conduct was wilful was clearly erroneous. We disagree.

"Whether a party's conduct is wilful is a question of fact. . . . The term has many and varied definitions, with the applicable definition often turn[ing] on the specific facts of the case and the context in which it

is used. . . . As we previously have observed . . . wilful has been defined [as] voluntary; knowingly; deliberate . . . [i]ntending the result which actually comes to pass; designed; intentional; purposeful; not accidental or involuntary . . . or with indifference to the natural consequences. . . . Wilful misconduct has also been defined as intentional conduct that is deemed highly unreasonable or indicative of bad faith." (Citations omitted; internal quotation marks omitted.) *Cathedral Green, Inc.* v. *Hughes*, 174 Conn. App. 608, 622–23, 166 A.3d 873 (2017).

We conclude that the court's finding was not clearly erroneous. Wilfulness reasonably can be inferred from GMAC's voluntary act of reporting to credit reporting agencies the nonpayment of the mortgage that was caused by GMAC's own failure to withdraw the mortgage payments from Sandra Sheldon's checking account and its subsequent failure to restore the defendants' credit. See *19 Perry Street, LLC* v. *Unionville Water Co.*, 294 Conn. 611, 623, 987 A.2d 1009 (2010) (intent may be inferred from conduct and circumstances).

3

The substitute plaintiff next argues that the court's finding that the defendants came to the court with clean hands is clearly erroneous. Specifically, it contends that the defendants' actions indicate that they came to the court with unclean hands because they "unilaterally demand[ed]" GMAC to satisfy the verbal agreement to their own undefined " 'satisfaction' " standard and failed to make any loan payments for more than a decade. It contends that it is clear that the defendants came to the court with unclean hands because they "made a complaint to the [department], and nothing happened. It is clear that the [department] found that the complaint had no merit . . . ." We are not persuaded.

As we have detailed in part I of this opinion, James Sheldon testified that GMAC did not restore his credit because GMAC declined to send correction letters to credit reporting agencies and that the absence of evidence regarding the outcome of the defendants' complaint against GMAC with the department does not indicate that their claim against GMAC was without merit. We conclude that the substitute plaintiff has not demonstrated that the court's finding that the defendants came to the court with clean hands was clearly erroneous.

4

The substitute plaintiff next argues that the court erred in finding that the defendants' economic downfall was caused by GMAC's actions. It contends that the defendants' loan was current as of November, 2009, that the defendants' credit was restored as of July, 2009, and, therefore, that the defendants' failure to obtain

new credit cards after July, 2009, and the defendants' economic difficulties from 2009 through 2020, was outside the control of the substitute plaintiff. We are not persuaded.

The court found that, "[q]uickly after those negative credit reports began, and because of them—that is, because GMAC stopped taking the defendants' payments and started reporting as their default what was GMAC's fault—all [of] [James] Sheldon's credit cards were cancelled." The court determined that there was no evidence contradicting James Sheldon's testimony that, after GMAC stopped taking the automatic biweekly payments, it reported, without justification, the resulting nonpayments to credit reporting agencies as defaults, and that those reports "eviscerated the defendants' credit and caused [James] Sheldon to be unable to continue his career in multistate construction management."

There was evidence linking the defendants' economic difficulties to the actions of GMAC in failing to restore the defendants' credit. James Sheldon testified that GMAC failed to restore his credit by not sending letters of correction to the credit reporting agencies. He further testified that he followed the advice of an agent with the department, who had advised him, "[D]o not make another payment until such time as you've straightened this out." He explained that he tried to contact GMAC and, later, Ocwen to resolve the situation, but that it was "impossible" because "they never made any effort to reach a resolution" and that they "didn't wanna talk," but said they would "pass it up the chain," and no one would discuss the matter because information concerning this issue was not in the file. He testified that "the most important thing that we do was to get our credit restored. GMAC was responsible for the destruction of that." He stated that, even during the time frame wherein GMAC was "investigating the mortgage, GMAC kept sending that little note to the credit bureau saying [he was] not paying his mortgage. I needed that off the books. They agreed to do it . . . if I brought the account up to date, gave them three extra payments to cover the period of time that it would take . . . for the credit bureaus to actually get the paperwork entered into the system. I agreed to that." He further testified that his credit rating was destroyed and that "[n]owhere did anybody think that . . . for ten years, they would continue to report . . . no, he didn't make his mortgage payment this month."

The substitute plaintiff's argument that the ruination of the defendants' credit is unconnected to GMAC's actions in failing to take the biweekly payments under the bisaver program is based on the incorrect premise that GMAC had *restored* the defendants' credit as of July, 2009. As the court found, GMAC did not restore the defendants' credit. It reasonably can be inferred

from James Sheldon's testimony that GMAC's failure to restore the defendants' credit led to and caused the defendants' financial ruin. The court determined that "the degree of the defendants' financial ruin caused by GMAC long before this action began has increased over the life of this action by the length of time the defendants have suffered the effects of GMAC's unjustified and unremedied ruin of their credit [and] their financial reputation . . . ." The court further reasoned that it regarded Duggan's July 27, 2009 letter, in which he stated that GMAC sent an "amendment" to credit reporting agencies for the September, 2008 through June, 2009 payments, as an admission "of the foreseeable damage to the defendants' credit: any credit reporting company, or actual or prospective creditor relying on such company's report on the defendants, would dismiss the defendants' credit on seeing a report of ten months [of] failure to pay their mortgage." The court drew reasonable inferences from the evidence in this regard. In light of the foregoing, we conclude that the court's finding that GMAC's act in reporting its own failure to take the authorized biweekly payments GMAC as defaults caused the defendants' financial ruin was not clearly erroneous.

B

The substitute plaintiff's final claim is that the court did not properly balance the equities when it "wiped out [the substitute plaintiff's] lien based on oral testimony that lacked documentary proof to show that the credit was not corrected or documentary evidence that [the substitute plaintiff] somehow caused [the defendants'] 2019 credit denials. The flimsy evidence offered by [the] [d]efendants does not equal or justify wiping out a consensual lien and giving the [d]efendants a free house. None of the above factors appear[s] to have been considered by the [c]ourt." We disagree.

"This court will reverse a trial court's exercise of its equitable powers only if it appears that the trial court's decision is unreasonable or creates an injustice. . . . [E]quitable power must be exercised equitably . . . [but] [t]he determination of what equity requires in a particular case, the balancing of the equities, is a matter for the discretion of the trial court." (Internal quotation marks omitted.) *Thompson* v. *Orcutt*, 70 Conn. App. 427, 435, 800 A.2d 530, cert. denied, 261 Conn. 917, 806 A.2d 1058 (2002). "How a court balances the equities is discretionary but if, in balancing those equities, a trial court draws conclusions of law, our review is plenary." (Internal quotation marks omitted.) *New Breed Logistics, Inc.* v. *CT INDY NH TT, LLC*, 129 Conn. App. 563, 571, 19 A.3d 1275 (2011).

As we have previously explained in this opinion, the court's findings that GMAC did not restore the defendants' credit and that GMAC's misconduct led to the defendant's economic difficulties were not clearly erro-

neous. See parts I and II A of this opinion. The substitute plaintiff cannot prevail on its argument that the court improperly balanced the equities because it credited James Sheldon's testimony, which the substitute plaintiff argues is "flimsy." It was in the court's province to do so. See *Gianetti* v. *Norwalk Hospital*, supra, 304 Conn. 772–73.

The substitute plaintiff, nevertheless, contends that, even if the court properly credited James Sheldon's testimony, it "was not entitled to wipe clear a $308,380.43 loan obligation . . . ."[9] The court, however, is permitted, in the exercise of its discretion, to withhold the remedy of foreclosure based on equitable considerations and principles. See *U.S. Bank National Assn.* v. *Blowers*, 332 Conn. 656, 671, 212 A.3d 226 (2019). "[E]quitable remedies are not bound by formula but are molded to the needs of justice." (Internal quotation marks omitted.) *McKeever* v. *Fiore*, 78 Conn. App. 783, 788, 829 A.2d 846 (2003). "[T]he trial court enjoys broad discretion in considering whether to grant a mortgagee the remedy of foreclosure for the default of a mortgage loan." *ARS Investors II 2012-1 HVB, LLC* v. *Crystal, LLC*, 324 Conn. 680, 685, 154 A.3d 518 (2017).

We find no merit in the substitute plaintiff's claim that the court failed to consider multiple factors in its favor, such as the defendants not having paid the mortgage in more than a decade. The court's articulation makes clear that it considered all relevant factors and rejected the substitute plaintiff's argument that the balancing of the equities weighed in its favor. The court stated in its articulation that, "[i]mplicitly, the [substitute] plaintiff claims that the court, its findings of fact notwithstanding, should have concluded that the defendants not making a mortgage payment in more than ten years is the greater inequity than the [substitute] plaintiff's predecessor destroying the defendants' credit, in turn destroying [James] Sheldon's career and earning capacity and the defendants' ability to pay the mortgage. Implicitly, the [substitute] plaintiff argues that, given the facts found by the court, the defendants should lose more than they, due to GMAC's and [the] successor mortgagor Ocwen's conduct in credit reporting, have already lost: they should lose their home, too. The court rejected that analysis of the equities of the present case."

In its memorandum of decision, the court reasoned that "the defendants have suffered the effects of GMAC's unjustified and unremedied ruin of their credit, their financial reputation; and by the length of time they have endured the burden and stress of this foreclosure action, which the court finds, to the extent retrospective prognostications may be considered in equity, would have been unnecessary had GMAC, in whose shoes the plaintiff and its principal stand, promptly repaired the damages it unjustifiably caused to the defendants'

credit." (Footnote omitted.)

Finally, we note that the remedy ordered by the court does not "wipe clear" the defendants' obligation under the note. The court did not hold that the substitute plaintiff may not pursue its legal remedy to enforce the note. Instead, it held that the plaintiff is not entitled to the equitable remedy of foreclosure. See *JP Morgan Chase Bank, N.A.* v. *Winthrop Properties, LLC*, 312 Conn. 662, 674, 94 A.3d 622 (2014) ("[u]nlike the equitable nature and aims of foreclosure, a claim on the note at law is grounded in contract, and is enforceable as between the parties to that contract—the debtor and the creditor, as well as persons who succeed to those obligations or rights by transfer or assignment").

On the basis of the court's factual findings of inequitable misconduct by GMAC and its successor, Ocwen, we conclude that the court properly acted within its discretion when it determined that a reasonable balancing of the equities weighed in favor of the defendants.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] "MERS does not originate, lend, service, or invest in home mortgage loans. Instead, MERS acts as the nominal mortgagee for the loans owned by its members. The MERS system is designed to allow its members, which include originators, lenders, servicers, and investors, to assign home mortgage loans without having to record each transfer in the local land recording offices where the real estate securing the mortgage is located." (Internal quotation marks omitted.) *Chase Home Finance, LLC* v. *Fequiere*, 119 Conn. App. 570, 572 n.2, 989 A.2d 606, cert. denied, 295 Conn. 922, 991 A.2d 564 (2010).

[2] The record reflects that at or around the time that the mortgage was assigned to Ocwen, it also was "referred to foreclosure." Nevertheless, the foreclosure action that is the subject of this appeal was not instituted until September, 2017. James Sheldon testified that this delay caused the defendants additional harm and that he made several requests that if Ocwen was going to foreclose on the property it do so quickly so that the matter could be resolved and the defendants' credit standing could be restored in a timely fashion. The court, in its memorandum of decision, stated that it found James Sheldon's testimony "credible and, in essence, accepts it."

[3] Although the substitute plaintiff makes a passing reference in its appellate brief to the defendants' unclean hands defense being "unstated," it does not challenge the court's construction of the defendants' narrative special defenses as including a claim that the plaintiff acted with unclean hands. Furthermore, to the extent that the substitute plaintiff's passing reference to the defense being unstated could be construed as an argument that the court should not have considered such a defense because it was not specifically pleaded by the defendants, we note that "in light of the court's inherent equitable powers in a foreclosure action . . . [a trial court may properly] consider the equitable doctrine of unclean hands without it being specifically pleaded." *McKeever* v. *Fiore*, 78 Conn. App. 783, 789, 829 A.2d 846 (2003).

[4] The substitute plaintiff took the note subject to all defenses that could be asserted by the defendants, including equitable defenses. See *Bank of America, N.A.* v. *Aubut*, 167 Conn. App. 347, 371, 143 A.3d 638 (2016).

[5] The defendants failed to file an appellee's brief as ordered by this court. This court, therefore, ordered the appeal to be considered on the basis of the substitute plaintiff's brief and the record, as defined by Practice Book § 60-4.

[6] The court noted that, despite the arguable lack of consideration for the verbal agreement, it was GMAC's responsibility to restore the defendants' credit whether or not the defendants resumed payments.

[7] Because James Sheldon made these statements when he was not under oath during the testimony of the plaintiff's sole witness, the court interpreted

his statements as clarifying his position to the court.

[8] The substitute plaintiff argues its sole witness, Peter Killinger, an analyst in its foreclosure department, testified, in reference to the July 31, 2009 letter, that GMAC restored James Sheldon's credit because "[w]ell, it says here that they did." Although the court did not specifically mention this portion of Killinger's testimony, it implicitly rejected Killinger's interpretation that the letter established this correction and instead credited James Sheldon's testimony that GMAC did not restore the defendants' credit.

[9] The court noted that the amount of the debt was in dispute and that it was not necessary to find the amount of the debt because that issue was not actually litigated at trial. We note that the original promissory note was for $182,000.